**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ronald MORELLI, Defendant-Appellant.**

**No. 79–5031.**

United States Court of Appeals, Sixth Circuit.

Argued April 1, 1980.
Decided Feb. 27, 1981.

S. Allen Early, Jr., Detroit, Mich., for defendant-appellant.

James K. Robinson, U. S. Atty., Detroit, Mich., Marshall Tamor Golding, Sidney M. Glazer, U. S. Dept. of Justice, Appellate Section, Criminal Division, Washington, D.C., for plaintiff-appellee.

Before WEICK, LIVELY and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

Ronald Morelli was found guilty by a jury in the United States District Court for the Eastern District of Michigan of con-

ducting the affairs of an enterprise through a pattern of racketeering activities and through the collection of unlawful debts, in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) (1976); of conspiring to violate the Act, 18 U.S.C. § 1962(d) (1976); and of two counts of wire fraud, 18 U.S.C. § 1343 (1976), the conviction of which was a predicate to his conviction under RICO, 18 U.S.C. § 1961(1) and (5) (1976).

Before the case was submitted to the jury, the trial court granted a judgment of acquittal on six other counts of the indictment charging Morelli with wire fraud (count 4), extortion (counts 6 through 9), and the use of wire facilities to facilitate extortion (count 10).

In acquitting Morelli on counts 4, 6, 7, 8 and 9, Senior United States District Judge Ralph M. Freeman held that while there was "substantial evidence that an enterprise existed, that its affairs affected interstate commerce and that the defendant Ronald Morelli was associated with the enterprise," the evidence connecting Morelli with the particular conduct dismissed was insubstantial. This conduct, Judge Freeman found, was not a sufficiently foreseeable result of Morelli's participation in the conspiracy to justify its use as the basis for his conviction on that count. With respect to count 10, charging wire fraud in the extortion of Charles Wicks, Judge Freeman found that there was absolutely no evidence to connect the defendant with the extor-

tion. Judge Freeman further held that even if the language of the indictment was read to include an attempt to collect an unlawful debt, without reference to extortion, it was "clear that the attempt to collect an extention of credit is not a violation of section 1962." [1]

### I.

Before addressing the specific alleged bases for reversal, it is necessary to describe in some detail the nature of the enterprise in which Morelli and his associates were involved.[2] The general purpose of the enterprise was the development of continuing schemes (or "scams") to obtain money from unwitting but vulnerable victims.[3] A careful examination of the trial record generally confirms defense counsels' claim that Morelli's contact with the individual victims of individual scams was limited. This factor, clearly, persuaded the district judge to acquit Morelli on five of the counts charging predicate crimes. Nonetheless, as the trial judge observed, there was ample evidence of Morelli's full involvement in the enterprise and in the conspiracy itself. Morelli acted as business manager of the enterprise, dealing purposely through other members of the enterprise. As will be described later, Morelli surfaced most visibly in the Hutton scam, which formed the basis for his conviction on the two wire fraud counts.

In operating the enterprise, each scheme or "scam" was carefully crafted by the en-

---

**1.** Judge Freeman's ruling on the defendant's motion to dismiss, which addresses each count of the indictment, reflects the great care with which he considered and disposed of each claim. *See* Appendix, vol. 5, at 1021–41.

**2.** Named as co-defendants with Morelli in the RICO and conspiracy counts of the indictment were Robert LaPuma, also known as "Bob" and "Big Bob," Thomas Misko, "Tom" or "Tommy," Augustino Giordano, or "Augie," Curtis Turbyfill, Joe Melfi, John Groff, and Mike Groff. Also named in the conspiracy count was Ronald Jones. Morelli originally went to trial on May 1, 1978, with the other defendants. However, Judge Freeman declared a mistrial as to the case against him when his defense counsel had to undergo emergency surgery. He was thereafter tried alone by another

jury empanelled August 24, 1978. On conviction, he was sentenced to 15 years imprisonment each on the RICO and conspiracy counts and to five years on each of the two predicate crimes, the terms of the sentences of each count to run concurrently. He was also fined $10,000.

**3.** While the term "scam" finds no dictionary definition, counsel for the parties have throughout the appeal employed the term either as a noun or a verb, to describe a specific unlawful scheme. Apparently the term is enjoying some current popularity in use, *e. g.*, "Abscam," meaning, I suppose, an Arab scam. To devotees of Robert Redford movies, the term is probably synonymous in meaning with "sting."

terprisers to appeal to the victim's particular weakness, whether for gambling, sex, or dishonest profit. It was the government's theory that Morelli was the *de facto* head of the enterprise, coordinating its activities, passing judgment upon various schemes proposed by the other members, and acting as a reliable treasurer. The principal front man, and prime witness for the government, was Peter Luca.

Luca had an extensive criminal record, including possession of counterfeit notes, illegal gambling, extortion, check fraud, and procuring for gross indecency. For over twenty years he had derived his income from running gambling games and providing women for prostitution. Luca's specialty was gambling. He acted often as dealer or banker in card games involving marked cards, loaded dice, hand signals and other devices to insure that the elements of chance did not interfere unduly with the profitability of the business. Luca's decision to cooperate as a government witness came not so much from any resolution to reform his life as from distaste for a ten-year prison term earlier imposed upon him for extortion. Counsel for the defendant persuasively argue that Luca's credibility was substantially affected by his past unsavory record and by his present desire to escape prison life by testifying to anything which he might think would advance the day of his freedom. As counsel point out, he was successful. He did, indeed, obtain a release after serving only one and one-half years of his ten-year sentence. All the same, the jury rather clearly believed most of his testimony, no doubt because it was largely corroborated by other witnesses. We are, therefore, bound to view the evidence, including Luca's testimony, in the light most favorable to the government.

The proof at trial related to five scams, the victims of which were Ed Vervane, Jr., Charles Wicks, Kenneth Pichette, Gordon Glaser, and finally, James Hutton. A summary of the testimony concerning each scam is necessary to understand the pattern of the overall operation.

Ed Vervane, Jr. had a wealthy, indulgent father. Young Vervane had long been a friend of Luca. Through Luca, Vervane became acquainted with co-defendant Robert LaPuma. It was LaPuma who thereafter devised a scheme to involve Vervane in a rigged game of "liars poker." Accordingly LaPuma, Luca and Morelli devised a plan. Luca was to bring Vervane to meet Morelli and LaPuma at a restaurant on the pretext that they would all go to a party where they could meet some girls. Once there, Vervane was to be enticed into a game of "liars poker" with Morelli, Luca and LaPuma. The game, rigged by signals, was to be for a "dollar a hand." Only when Vervane had lost "$16" was he informed by Morelli that a dollar, in the terminology of the players in this exclusive group, meant $100 and that he was therefore in their debt to the tune of $1600. Proceeding with the scheme, Luca and LaPuma then talked the gullible Vervane into trying to recoup his losses. Predictably the debt grew to $3,000. The enterprisers, already familiar with Vervane's father, also knew that the father would instinctively protect the son, especially if the money was owed to members of the mob or the Mafia. Relying upon this, they proceeded to have Vervane roughed up by LaPuma and to threaten Vervane's father, resulting in the ultimate collection of the debt. Morelli gave Luca $600 as his share.

Gambling formed the basis for the scam which involved Charles Wicks in 1972. A real estate broker in Warren, Ohio, Wicks was lured into a card game called "stacks," operated by Luca with the aid of co-defendants LaPuma, Curtis Turbyfill, John Groff and Mike Groff.[4]

The Wicks scam was a refinement of the Vervane scam. LaPuma, who apparently was seen by his cohorts to possess the proper physical appearance and reputation to qualify him as a member of the "Mafia,"

---

4. The appeals of John M. Groff and Curtis Turbyfill from their conviction in the earlier trial are the subject of a separate appeal in this court and an opinion affirming their individual convictions has been entered concurrently with this decision.

was chosen to win the game while Wicks and the other conspirators were to be the losers. The game was rigged by the use of marked cards and hand signals. Wicks lost $10,000. No collection, of course, was made from the other apparent losers. Wicks only had $500 on him at the time. It took six to eight months for him to pay off the remainder of the debt, accomplished in part by a deed to certain property, by cash, and by check. Still gullible, Wicks was enticed into another game at a race track in West Virginia. He lost $1,200. Morelli became concerned when LaPuma was only able to collect $4,000 or $5,000 of the debt and Wicks appeared to be stalling on the payment of the rest of it. He thereafter pressed Luca and LaPuma to pursue collection, and suggested that they persuade Wicks to accompany them to Las Vegas, where they could at least get $5,000 through the use of his casino credit card. Luca or LaPuma transmitted the payments they received from Wicks, and Morelli who thereafter divided the money gave them their share. As noted earlier, Judge Freeman dismissed the count of extortion against Morelli because the government was unable to sufficiently connect Morelli with the extortionate efforts which it claimed had been made to obtain payment of this gambling debt.

In late 1971 or early 1972, Morelli came up with a scheme to involve Kenneth Pichette, a jockey, in a rigged card game with the expectation that when he was unable to make good on his anticipated losses, Pichette could be persuaded to fix a horse race. Pichette predictably lost $3,000, but Morelli concluded that the loss was not sufficiently large to persuade Pichette to fix a race. He therefore told Luca and LaPuma to collect the money instead. Pichette finally managed to pay off between $1,500 and $1,800 of the debt. Luca collected it and passed it on to LaPuma or Morelli, who thereafter divided the profits.

Gordon Glaser, a young man from Shaker Heights, Ohio, was lured into a scam by the wiles of Luca's girlfriend, one Lynn Offerdahl, whom he met, with Luca, at a race track at Windsor, Ontario. Though Lynn was Luca's girlfriend, Luca was not averse to sharing Lynn's favors with Glaser for a fee. Thereafter Luca, LaPuma and Morelli discussed the possibility of introducing the gullible Glaser to their customary rigged games. After four games, which took place over a one-year period at Luca's residence, Glaser lost between $10,000 and $14,000. In each case, Glaser could only pay a small part of the loss at the time incurred, and his credit was accepted. His later payments, when collected, were given to Morelli who thereafter divided the profits with the other participants. Typically, Morelli does not appear to have actually participated in the games at Luca's residence, although his role as control man and banker was clearly established.

The crowning achievement of the enterprise was the scam involving James Hutton, a wealthy building contractor and insurance man from Detroit. Luca had known Hutton since 1969 and had sold him pornographic films and provided women for Hutton's insurance business. Early in 1970, Luca, Morelli and LaPuma discussed trying to get Hutton involved in the traditional "game of chance." In two efforts, Luca failed. If Hutton remained uninterested in gambling, he was not, however, immune from the suggestion that he might reap huge profits from various schemes which Luca, LaPuma and Morelli concocted as part of their program to part Hutton from his wealth.

At Morelli's suggestion, Luca persuaded Hutton that he and LaPuma had an opportunity to obtain a trailer laden with stolen J & B Scotch whiskey which could be resold to the Mafia for between $100,000 and $200,000 and that $20,000 was needed to finance the operation. Hutton, interested, asked Luca to introduce him to Thomas Misko, who was purported to be an expert in the field of stolen merchandise and who supposedly was running the operation. As a result of that meeting, Hutton put up between $8,000 and $9,000 with the belief that the rest of the $20,000 was being invested by Misko, LaPuma and Luca. Once more the money was turned over to Morelli who in turn divided it among the partici-

pants in the scheme. Needless to say, Hutton never saw any part of his investment again.

Thereafter between 1972 and 1974, Hutton, ever gullible and ever anxious to recoup his growing losses by involvement in further, non-existent illegal schemes, was bilked of approximately $200,000. Those schemes included the selling of stolen grain to a race horse owner in Florida, dealing in stolen snowmobiles, cigarettes and television sets, stolen women's apparel, appliances, and in narcotic pills. Each time when the particular scheme failed to produce any return, Hutton was put off by the explanation that the police had intervened to defeat the project. The enterprising conspirators even went so far as to stage a fake arrest of LaPuma for Hutton's benefit, at Morelli's direction.

While it appears incredible by hindsight, the conspirators even took advantage of the supposed failure of the concocted schemes to obtain further money from Hutton. Thus, he yielded up an additional $5,000 to pay bail money for LaPuma as a result of his fake arrest, and another $6,000 to pay what was represented as a mob contact in Cleveland to expedite the sale of the narcotic pills. He also was induced to part with $5,000 or $6,000 to pay co-defendant Turbyfill to leave town, upon the representation that the latter was an informer. Another $500 was extracted on the pretext that it was needed to bail out a driver who was arrested while driving one of the trucks containing stolen merchandise. Another $1,500 was paid on the representation that it was required to hire a bulldozer to free a truck which had been bogged down in soft dirt. In each case, the money obtained from Hutton was given to Morelli for division among the various participants in the scam.

All of this time, Morelli himself remained in the background. Late in 1972, however, Hutton asked to see Morelli to find out why all of his investments had gone bad and to obtain some sort of a guarantee that eventually he would recover his investment. As Luca put it:

A  Well, after all the screaming and the yelling, and the scamming on him and scheming, he [Hutton] was frustrated. He said he wanted to meet the main man, he was tired of being screwed around, that why was the Mafia letting all these things get away and go down and how are we allowed to let him get away with it if we were connected with the mob, and he wanted to meet personally with Mr. Morelli, and he was tired of being screwed around and he wanted a guarantee now that his money was going to come back. In other words, he finally wanted to complain to the main people.

Q  What had you told Mr. Hutton about Mr. Morelli?

A  We told him he was our main man in front of the Giacalones and that he represented the outfit and that he was our boss.

When Morelli was told that Hutton was becoming a problem, that he might go to the law or quit giving money, he decided to meet with him. According to Luca, Morelli said: "O.k., it's time to sit him down. Bring him to me. Try to hit him for one big cash load, one big total amount, and if we get it, we'll just end it and wipe him out and we don't want to see him no more." At this meeting, Morelli discussed a new venture with Hutton wherein Morelli proposed to send Luca and LaPuma to Mexico to bring back some narcotics. The proceeds from the sale of these narcotics, Hutton was told, would be more than sufficient to recoup all of his losses and generate a profit for him of $100,000. Hutton, however, would have to put up $35,000 to $50,000 to finance the operation, with Morelli supposedly putting up a like amount. By this time Hutton was beginning to shed his naiveté; this time he decided to think about it and let the conspirators know his decision later.

About the same time, Morelli and his entourage were planning a vacation in Florida, a trip which Luca told Hutton was necessary to transact the narcotics deal.

Hoping to wrap up this deal before they left, Morelli ordered another meeting with Hutton to again try to convince him to invest in this venture. Luca recalled the conversation at this second meeting as follows:

Well, Mr. Hutton came in and Mr. Morelli said, "Sit down" and "What is your decision? What are you going to do? We're getting ready to go. Everything is all set." Mr. Hutton said, "I'm having problems and I don't know if I can get that much cash up right now. I'm not sure yet." Mr. Morelli said, "Well, if you want to get your hundred thousand dollars back, here's your chance at one time, so give Pete a decision right away or it's going to be too late. You've only got another week or two to make your decision." Mr. Hutton said he might need a little more time and he didn't know if he can go for it or if he can get that kind of cash at this time. That was the end of the conversation.

The testimony of the victim, Hutton, generally corroborates that of Luca. He quite freely acknowledged his own culpability. Cross-examined by counsel for Morelli, Hutton explained the technique which ever more deeply involved him in financial loss:

A They would always come back with another story that they were going to get my money back, they were going to have something else and they guaranteed me I would have my money back and they would get me involved in another one.

Q In other words, the next story was better than the last?

A Yes.

Q Weren't you bothered by the fact that this was stolen stuff you were buying?

A Yes, I was.

Q But you didn't stop?

A I was just trying to get my money back.

Hutton, in a minor divergence from Luca's testimony, remembered meeting with Morelli on a total of four occasions to discuss his losses. Three of these meetings, according to Hutton, were rather brief. The narcotics deal was suggested during the fourth meeting. Hutton testified:

Q Did you speak with Mr. Morelli at this meeting?

A Yes.

Q Can you indicate, please, what you said to Mr. Morelli and what his responses were?

A He said they had another package put together and that I would have to come up with $30,000 and that they would—they were going to have Bob LaPuma and Pete Luca go down to the islands and get a load.

Q Did he indicate what "get a load" was?

A It was referred to as dope. They didn't say dope but that was the impression that they gave me.

Q What was your response?

A I told him I was broke and couldn't come up with $30,000.

Q Did Mr. Luca or Mr. Misko or Mr. LaPuma say anything about that at that third meeting?

A Well, they kept pushing me to try to see if I would come up with this money.

     *     *     *     *     *     *

Q (By Ms. Simms, continuing): When you indicated to Mr. Morelli that you were broke and didn't have the money, what was his response, if any, to that?

A He got very irritable with Bob LaPuma and Pete Luca and said they had no business arranging that meeting, knowing that I didn't have the money. And the conversation did come up at that time that the only way I could get the money was to put a mortgage on my home, and right away Morelli wanted to know how long that would take, and I said probably a month. And this is where he was very upset and he went stomping out.

What happened thereafter in the development of this narcotics scam forms the background for the four counts of which Morelli was subsequently convicted: counts three and five, the wire fraud charges, count one, the RICO violation, and count two, the conspiracy to commit a RICO violation. Since Hutton still had not agreed to put up the money to finance the narcotics deal by the time Morelli left for his vacation in Florida, he decided to have Hutton invited to join him there. Luca testified:

> I discussed with Mr. Morelli, they told me where they were going to be, said they would be at the Newport, come on down there, that we would vacation, and while we were vacationing we would call Mr. Hutton. And I was told that I should call him and try to get him to come down there to show him I was down there and try to have him and his wife come down there and we would take him out on maybe a Teamsters yacht and party him and his wife, and influence him down there to maybe still get this $35,000 to put up for the drugs.

Thereafter Luca testified to the telephone call which formed the basis for count 5:

Q   What did you say to him [Hutton]?

A   Told him I was at the Newport, I was standing there with Mr. Morelli, that he had made a decision or would him and his wife want to come down, that there was a lot of influential people around there and that it looks pretty good on that drug scene to come down, and did he want to come down, him and his wife, right now. He said no, he didn't know if he could make it. I said, "Well, you want to talk to Mr. Morelli?" He said, "Yes," and I handed the phone to Mr. Morelli.

\*   \*   \*   \*   \*   \*

Q   (By Ms. Simms): What did you hear on your end of the phone that Mr. Morelli said?

A   "Jim, have you made a decision? Come on down.... We're partying, and also get down or your're going to miss the boat on getting your money

back in a hurry. So are you going to come down?" That's what I heard.

Q   Was that the end of the conversation with Mr. Hutton and [sic] Mr. Hutton?

A   Yes, he hung the phone up.

Q   Did you ever receive any money in Miami from Mr. Hutton?

A   Yes, I did.

Q   Approximately how much money, if you recall?

A   I don't know. Couple hundred dollars or so.

Q   Do you remember approximately when that was?

A   Well, at the same time that I was down there in Miami.

Q   Mr. Luca, would you please look at what has been marked as Government's proposed exhibit 26, and without telling the jury what that is ... does that refresh your recollection at all as to the dates you were actually in Miami?

A   Yes.

Q   Could you give us what date that refreshes your recollection as to when you were in Miami?

A   February of 1973.

Q   Was that during the time that you also received some money from Mr. Hutton?

A   Yes.

Q   Is that also the time during which Mr. Morelli spoke with Mr. Hutton on the phone?

A   Yes, it was.

\*   \*   \*   \*   \*   \*

Q   (By Ms. Simms, continuing): What was the couple of hundred for?

A   Mr. Morelli, when he hung up the phone on Mr. Hutton and he said he wasn't going to come down or come with the thirty-five thousand, Mr. Morelli suggested I call him back and tell him at least mail some money down for expenses, give him a story and get some money down here for

expenses. And I called Mr. Hutton back and laid a story on him.

Q What was the story you laid on him?

A I told him that if I stuck around, something like I was running out of money and I had a chance to get a little piece of the action but I had no money, or something I laid on him, and I said, "I'm going to need five hundred or a thousand dollars. I says "Why don't you wire it down to me?" He wired me, I think, only a couple of hundred.

Q Is that the only money you received from Mr. Hutton while you were in Miami?

A I don't know. I think I got two wiregrams. I believe there was two. I'm not sure.

Q Do you recall approximately when the second one was?

A They were pretty close to each other. Maybe a week, two weeks apart. I'm not positive.

Q Do you remember what the second one was for?

A No. I know I laid another story on him. I don't know exactly what story I told him but it was a bullshit story.

* * * * * *

Q (By Ms. Simms): How long were you actually in Miami, Mr. Luca?

A Well, around two or three weeks.

* * * * * *

Q (By Ms. Simms): Mr. Luca, you said Mr. Hutton wired you money twice?

A I believe so.

Q Where did you pick the money up from?

A The Western Union wiregram, Western Union telegram.

Q Do you now recall who the actual wire money order was payable to?

A Who it was made out to?

Q Yes.

A To me.

Q What did you do with the money once you got it?

A Picked it up and went back to the Newport motel and told Ronnie and the guys that were sitting there we had some money, he didn't send me that much but we had some money. Mr. Morelli said, "We'll just spend it to pick up the tab."

Again, on the matter of the telephone call(s) from Florida to Michigan, Hutton's testimony differs just slightly from Luca's. Hutton remembered the conversations with Luca about traveling expenses and with Morelli about the narcotics deal as occurring during the same phone call. Hutton's testimony did confirm, however, that he sent a wire money order for $200 to Luca in Miami, and that a telephone conversation with Luca and Morelli preceded the sending of this money. Hutton testified:

Q What circumstances resulted in your sending that money order?

A Pete Luca was in Florida, and he called me at home and needed some money for traveling expenses.

Q What was your response?

A At first I wasn't going to give it to him. I told him that was his problem.

Q And what did he respond to that?

A Well, they kept talking there and finally I agreed that I would send it down the first of the week.

Q Did you talk to anyone else other than Luca in Miami?

A Yes.

Q Who was that?

A At the same telephone conversation Morelli got on the phone and assured me that everything was all right, that I was going to get my money back and to go along with these guys, meaning Misko, Luca and LaPuma.

Q Did you recognize that as being the voice of Mr. Morelli?

A Yes.

Hutton's testimony was supported by government exhibit 44A, a Western Union telegraphic money order receipt for $200 and a $7.90 service charge.

## II.

In his brief on appeal, Morelli outlines four claims of error as grounds for reversal:

I. A CALL TO MICHIGAN REQUESTING EXPENSE MONEY FOR A FLORIDA VACATION AND THE RESPONSE IN THE FORM OF A $200 WESTERN UNION MONEY ORDER WHICH WAS USED FOR VACATION EXPENSE MONEY WERE NOT SUFFICIENTLY RELATED TO ANY SCHEME OR SCAM TO BRING THE ACTIONS WITHIN THE WIRE FRAUD STATUTE.

II. THE REQUEST FOR FUNDS FROM FLORIDA AND THE RESPONDING WESTERN UNION MONEY ORDER DID NOT ESTABLISH THAT DEFENDANT WAS INVOLVED IN A PATTERN OF RACKETEERING ACTIVITY AS THAT TERM IS DEFINED IN 18 U.S.C. § 1961(5).

III. DEFENDANT MAY NOT BE CONVICTED ON RICO CHARGES WHERE THE GOVERNMENT FAILED TO ESTABLISH THE NECESSARY ELEMENTS FOR THE TWO PREDICATE WIRE FRAUD COUNTS AND THE TWO WIRE FRAUD COUNTS CONSISTING OF A REQUEST AND RESPONSE FAIL TO ESTABLISH A PATTERN UNDER TITLE 18 U.S.C. § 1961(5).

IV. THE RICO STATUTE IS UNCONSTITUTIONAL AS APPLIED TO DEFENDANT MORELLI.[5]

We have described in some detail the nature of the enterprise in which Morelli and his associates were involved because this description, more than any legal argument, fully demonstrates Morelli's deep involvement in the enterprise as a whole, and his guilt of the two predicate counts of wire fraud. Further, it demonstrates the connection of the telephone conversation and Hutton's subsequent act of wiring the money to the overall scam involving Hutton.

There seems to be some disagreement as to the number of telephone calls made, Luca remembering two and Hutton remembering only one coming to him from Morelli and Luca in Miami. Several years, of course, had elapsed between the dates of the occurrences in question and the testimony of the witnesses and it is indeed not at all surprising that some discrepancy should occur. This, of course, bore upon the credibility of the witnesses, but the discrepancy itself cannot be viewed as fatal in the context of this case. The actual sequence of events, by the testimony of the witnesses, was altogether clear, whatever the dates. There was ample evidence for the jury to have found beyond a reasonable doubt that, though there may have been some confusion in the actual dates, there was never any reasonable doubt that the telephone conversation and the mailing of the money did, in fact, occur and that the money was mailed as a result of the telephone conversation. There is likewise no showing of any surprise or any other prejudice to the defendant in the presentation of his defense.

Two separate acts were shown. The evidence clearly shows that they were related to the continuing efforts of Morelli and Luca to extract further cash from Hutton

---

5. There also appears to be some inconsistency in the dates set forth in the indictment. The telephone conversations were alleged to have occurred on or about February 7, and the transmittal of money occurred or was shown to have occurred on or about February 6, whereas the proof at trial unequivocally showed that the telephone conversations preceded the transmittal of the money. Morelli did not make this an issue on appeal, but the court has considered it *sua sponte*. This apparent inconsistency was not fatally defective to the indictment. In each instance, the language of the indictment recited that the particular activity was "on or about" the date specified. This type of pleading has long been practiced because, unless a particular date is made material by the statute creating the offense, the statute of limitations, or any evident prejudice that would come to the defendant by the lack of the actual date, the exact date upon which the offense was committed is not crucial. *See Ledbetter v. United States*, 170 U.S. 606, 612, 18 S.Ct. 774, 776, 42 L.Ed. 1162 (1898); *United States v. Antonelli*, 439 F.2d 1068 (1st Cir. 1971).

as part of their ongoing scheme to defraud him. That they achieved only limited results and that they applied the funds to their own pleasure does not detract from the fact that the purpose of the call was to advance their overall fraudulent scheme, and to retain Hutton's interest in getting his money back by going along with the request for further money. In short, the evidence was altogether ample, that both the telephone call from Morelli and Luca to Hutton and the act of wiring the money were two separate activities which were a part of the pattern of racketeering activity as that term is defined in 18 U.S.C. § 1961(5) (1976). That Hutton himself sent the money, and that Morelli and Luca did not, is immaterial to the question of Morelli's guilt of having by his conduct brought about that act. *United States v. Conte*, 349 F.2d 304 (6th Cir.), *cert. denied*, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965).

### III.

■ As indicated in section II, Morelli contends that the RICO statute is unconstitutionally vague as applied to his conduct in this case. At the same time, Morelli's counsel acknowledge that the RICO statute itself has survived various void-for-vagueness challenges. *See United States v. Aleman*, 609 F.2d 298 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Huber*, 603 F.2d 387 (2d Cir. 1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *United States v. Swiderski*, 593 F.2d 1246 (D.C. Cir.1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2055, 60 L.Ed.2d 662 (1979); *United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976); *United States v. Campanale*, 518 F.2d 352 (9th Cir. 1975), *cert. denied sub nom. Grancich v. United States*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976); *United States v. Thevis*, 474 F.Supp. 134 (N.D.Ga.1979) (as applied); *United States v. Chovanec*, 467 F.Supp. 41 (S.D.N.Y.1979); *United States v. Stofsky*, 409 F.Supp. 609 (S.D.N.Y.1973), *aff'd*, 527 F.2d 237 (2d Cir. 1975), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976).

■ In his brief, Morelli's counsel employ Luca's testimony to describe Morelli's role:

He was our man. He was the one that if we ever had to use a name, for any influence or any problem supposedly, if anybody gets uptight like Mr. Hutton and we said we represented the Mafia and they wanted to check us out, we could say, "Check with Mr. Morelli or the Giacalones," and we could use their names to get that influence, and that's the only reason we could get the money, because otherwise if we couldn't use their names, we wouldn't have the reputation they had.

As if Morelli were simply to serve as a vague background "enforcer" who himself never participated, his counsel now seek to claim that the statute would be vague as to him because the government never showed that he in fact ever participated in the conduct of the enterprise. Morelli was, however, found guilty of two predicate counts of wire fraud that were part of a pattern of racketeering activity. It is true that, perhaps from an abundance of caution, Judge Freeman dismissed the substantive extortion counts because in his view the government lacked probative evidence showing that Morelli knowingly allowed his name and supposed Mafia connections to be used as a means to coerce payment of the various debts. This ruling did not, however, dismiss the conspiracy count. Therefore, the testimony of Luca concerning the pattern of activity engaged in by the co-conspirators during the course of the conspiracy of which Morelli was a controlling member was in our judgment altogether admissible. This evidence clearly showed that the collection of an illegal debt was also a part of the enterprise.

### IV.

■ Morelli's claim that he was denied due process in that the RICO charge relating to the collection of an illegal debt resulting from the Vervane game was filed so long after the incident that he was unable to properly prepare his defense is without merit. In *United States v. Lovasco*, 431

U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), the Supreme Court held that in cases alleging improper pre-indictment delay, the reasons for the delay must be examined as well as any prejudice to the defendant. Here, Morelli makes an assertion of prejudice without presenting any facts that would support this claim. Neither does Morelli attribute any improper motives to the government in its delay in bringing this charge. Given the relatively successful nature of the parties' activities over a long period of time, it is not unlikely that the government lacked probable cause to bring the charge prior to the time it did so. Morelli should not now be allowed to benefit from any delay caused by the secrecy in which he operated.

■ We also find no merit in Morelli's claim that he was subject to cruel and unusual punishment in violation of the Eighth Amendment because he was sentenced to fifteen years for "obstensibly [sic] the same conduct" as that proscribed by the two wire fraud violations for which he received five years each. Morelli's reliance on *Downey v. Perini,* 518 F.2d 1288 (6th Cir.), *vacated and remanded,* 423 U.S. 993, 96 S.Ct. 419, 46 L.Ed.2d 367 (1975), as authority for his claim is altogether inappropriate. Congress may constitutionally make the commission of two crimes within a specified period of time and within the course of a particular type of enterprise an independent criminal offense punishable more severly than simply twice the penalty for each constituent offense. *United States v. Field,* 432 F.Supp. 55 (S.D.N.Y.1977), *aff'd,* 578 F.2d 1371 (2d Cir.), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978).

Morelli could have been sentenced to a total of ten years' imprisonment on the two wire fraud counts themselves, which involved only the scam on Hutton. In this light, the concurrent sentences here can in no way be construed as inappropriate and excessive for a continuing series of fraudulent activities engaged in over a period of several years in which Morelli was a high level figure.

Although not raised by the appellant, the government in defensive anticipation urges that RICO is not inapplicable under the facts in this case because it failed to allege the existence of a legitimate enterprise. This apprehension was clearly prompted by the original panel decision to that effect in *United States v. Sutton,* 605 F.2d 260 (6th Cir. 1980). That decision, of course, has since been vacated and superseded by the *en banc* decision of our circuit in *United States v. Sutton,* 642 F.2d 1001 (6th Cir. 1980), holding that there is no statutory requirement under RICO that the enterprise referred to in the Act be legitimate.

Affirmed.