**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Allan Harvey BIBBY (82–5705), Edgar Hardin Gillock (82–5717), A. Arthur Ayers (82–5723), Defendants-Appellants.**

**Nos. 82–5705, 82–5717 and 82–5723.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 19, 1984.

Decided Jan. 14, 1985.

Rehearing and Rehearing En Banc Denied
March 1, 1985 in Nos. 82–5705
and 82–5717.

Andrew J. Ekonomou, Kirby Atkinson, Ekonomou & Atkinson, Atlanta, Ga., Harold L. Klein (argued), James D. Causey, Jay Fred Friedman (argued), Memphis, Tenn., for defendants-appellants.

W. Hickman Ewing (argued), U.S. Atty., Michael C. Speros, Asst. U.S. Atty., Memphis, Tenn., for plaintiff-appellee.

Before MARTIN, CONTIE and WELLFORD, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Defendants Edgar Gillock, a former Tennessee state senator, and Arthur Ayers and Allan Bibby, former executives for Honeywell Information Systems, Inc., appeal their jury convictions for conspiracy, mail and wire fraud, extortion, and income tax fraud.

The charges against the defendants stem from their involvement in the sale of Honeywell computer systems. According to the indictment, the defendants were involved in a conspiracy to defraud Honeywell of both the honest and faithful service of its employees and substantial sums of money. The illegal activity began sometime in the fall of 1975 when Oliver Drew and Jack Owen, two other Honeywell employees, first contacted Mr. Gillock. Drew and Owen needed Gillock's assistance to help them sell a new Honeywell computer to Tennessee's Department of Employment Security. According to Owen, Gillock was valuable because he introduced Honeywell officials to influential people in the Tennessee legislature and helped "get the paperwork to flow." According to Drew, Gillock was important because of his "political influence."

After the Department of Employment Security announced plans to purchase a Honeywell computer, Gillock approached Owen and suggested that he be compensated for his efforts on behalf of Honeywell. Owen told Gillock that there was no "vehicle" available through which to pay Gillock directly. The company had a policy prohibiting monetary payments to public officials. Nevertheless, Owen devised a scheme to pay Gillock indirectly through a Louisiana consulting firm, Public Systems, Inc. Public Systems was controlled by Robert Grapp, a former Honeywell employee. Owen paid Public Systems $4,045 in two installments for non-existent services provided by Grapp. Grapp, in turn, sent the money to Gillock. The whole transaction took place with the knowledge and approval of Allan Bibby.

In the fall of 1976, the criminal enterprise entered a new stage. Bibby, Ayers, and Jack Camarda, another former employee who left Honeywell to start Financial Marketing Services, Inc., a company specializing in financing computer systems, concocted a plan to defraud Honeywell in transactions involving the sale of Honeywell computers financed by Camarda's company. The three agreed to a three-way split of profits realized on all sales financed by FMS in which Bibby and Ayers were involved in bringing Honeywell and FMS together. Because this arrangement was against Honeywell's conflict of interests policy, the three decided to conceal their profits by funneling them through cattle ranching operations which each owned. As a result of this scheme, Camarda paid Bibby and Ayers approximately $600,000 each from twelve computer sales financed by FMS between 1976 and 1980.

One of the transactions that Bibby and Ayers received a kickback on involved a computer sale to Shelby County, Tennessee. Throughout the first quarter of 1978, Honeywell had attempted to sell Shelby County new computer equipment to upgrade a system originally purchased from Honeywell in 1975. After encountering little initial success, Honeywell officials decided to call on their government contact from the past, Mr. Gillock. Oliver Drew made the initial contact. At their meeting, Gillock assured Drew that he had "influence in Shelby County" and said he would be happy to offer his assistance. However, Gillock also said he would have to be paid

for his troubles. Drew subsequently informed his superiors that Gillock wanted money.

On April 11, 1978, a meeting was held in Atlanta, Georgia, attended by Drew, Ayers, Gillock, possibly Bibby, and others, to discuss payment for Gillock. At that meeting, it was tentatively decided that Gillock would be paid ten percent of the contract price to Shelby County if and when the deal ever went through. Later, Bibby, Ayers, and Camarda had their own meeting and agreed that Gillock would be paid $150,000 out of their collective profit on the sale.

Bibby and Ayers also agreed that Gillock should be paid either a retainer fee or expense money while he worked on getting Shelby County to agree to upgrade its computer system. On April 26, 1978, Ayers called Jan Tyler, president and sole stockholder of Manmark, Inc., a Texas corporation, and asked him to mail Gillock $3,000 every month for six months. Because Tyler held the shares of Manmark in trust for Ayers, he did as Ayers requested. These six checks formed the basis of the mail fraud charges against Bibby, Ayers, and Gillock and all but one of the extortion charges against Gillock. Manmark was later reimbursed for the $18,000 by Financial Marketing Services, which was later reimbursed by Honeywell.

Shelby County finally bought the new computer equipment in October, 1978. On October 19, Camarda paid $130,365.61 to Gillock as his commission on the sale. This was less than the $150,000 originally agreed upon only because Camarda had decided he did not want to pay the full amount. Gillock was dissatisfied, but he had no recourse. He did express his dissatisfaction to both Camarda and, at a later date, Ayers. The money was not paid directly to Gillock but rather, at his request, to the Forsythe Vending Company. The president of Forsythe Vending, William Forsythe, was a close friend of Gillock. Gillock characterized the payment to Forsythe as a loan. Over the next three years, Forsythe gradually repaid Gillock the debt. He paid no money directly to Gillock. In-

stead, he paid some of Gillock's bills—attorney's fees, car payments, mortgage payments, and the like. Gillock never reported the $130,000 on his 1978 income tax returns.

This $130,000 commission, and a telephone call between Drew and Gillock arranging delivery of the check, later formed the basis for one of the two wire fraud counts against the defendants, one of the extortion counts against Gillock, and one of the tax counts against Gillock.

After paying Gillock his fee, Camarda still had $59,000 remaining. This amount he split with Bibby and Ayers pursuant to their ongoing agreement.

On June 14, 1982, a federal grand jury returned a twenty-count indictment against Gillock, Ayers, and Bibby. The indictment charged all three defendants with one conspiracy count, six mail fraud counts, and two wire fraud counts. The indictment also charged Gillock alone with seven Hobbs Act violations and four counts of tax fraud. One of the tax counts resulted from the above-mentioned failure to report as income the $130,365.31 fee from the Shelby County computer sale. The other three counts charged Gillock with making impermissible deductions for attorney's fees in calendar years 1977, 1979 and 1980. The trial began on October 12, 1982. The jury found all three defendants guilty on the nine counts common to each of them. The jury acquitted Gillock on the attorney's fee deduction counts but convicted him on the failure-to-report count. It also convicted him on the Hobbs Act charge stemming from the receipt of the $130,000 in the Shelby County deal. Because it could not reach a verdict on the other Hobbs Act counts, the trial judge declared a mistrial with respect to them. Bibby and Ayers were sentenced to three-and-one-half year concurrent sentences for each of their convictions and fined $10,000. Gillock was sentenced to four-year concurrent sentences for all but the tax conviction, for which he was given a three-year consecutive sentence. He was also fined $10,000.

On appeal, the defendants raise a number of issues. The first we must consider are defendants' allegations of misjoinder. Rule 8 of the Federal Rules of Criminal Procedure establishes limits for joinder of both defendants and offenses in the same trial:

(a) **Joinder of Offenses.** Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(b) **Joinder of Defendants.** Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

■■■ Bibby and Ayers argue that joinder of the tax counts against Gillock with the fraud and conspiracy counts against them is a violation of Rule 8(b) because the tax counts are not part of the "same act or transaction or in the same series of acts or transactions" as the fraud counts. They are at least partially correct. It is appropriate to combine tax charges against one defendant with fraud charges against that same defendant and other codefendants if the tax evasion charges arise directly out of the common illicit enterprise. See *United States v. Kopituk*, 690 F.2d 1289, 1313 (11th Cir.1982); *United States v. Kenny*, 645 F.2d 1323, 1344 (9th Cir.), *cert. denied*, 454 U.S. 828, 102 S.Ct. 121, 70 L.Ed.2d 104 (1981). Failure to report the income from an illegal activity is an act which does arise directly out of the common enterprise because concealment of ill-gotten gain is an integral part of assuring the success of that illegal activity. Accordingly, inclusion

of Count 17 in the indictment, charging Gillock with failure to report the $130,000 kickback on his 1978 tax return, was proper. The same cannot be said for Counts 18–20, which allege only that Gillock claimed excessive deductions for attorney's fees on his 1977, 1979, and 1980 tax returns. The fraudulent deduction of attorney's fees had absolutely nothing to do with defendants' overall scheme to defraud Honeywell. Accordingly, Counts 18–20 were misjoined with respect to Bibby and Ayers.

Gillock's argument for misjoinder relies on subdivision (a) of Rule 8 regarding joinder of offenses against the same defendant. The joinder provisions of Rule 8(a) are more liberal than those of 8(b) because they allow inclusion of offenses of the "same or similar character" as well as those arising from the same act or transaction or a common scheme. Under this standard, it would have been appropriate to join all the tax charges together against Gillock because they are of the same or similar character. Also, for the reasons stated above, it would have been acceptable to join Count 17 (failure to report) with the other fraud and conspiracy counts, but it is still not acceptable to combine Counts 18–20 with the other charges contained in the indictment. These are of "same or similar character" as Count 17, yet are wholly unrelated to any of the other charges. Accordingly, we find that misjoinder was also present in the charges against Gillock with respect to Counts 18–20.

Traditionally, the remedy for Rule 8 misjoinder was automatic reversal. *See, e.g., United States v. Reynolds*, 489 F.2d 4, 6 (6th Cir.1973), *cert. denied*, 416 U.S. 988, 94 S.Ct. 2395, 40 L.Ed.2d 766 (1974); *Ingram v. United States*, 272 F.2d 567, 570 (4th Cir.1959). Recently, however, a number of courts have recognized that misjoinder can, in some circumstances, constitute harmless error. *See, e.g., United States v. Halper*, 590 F.2d 422, 433 (2d Cir.1978) (misjoinder harmless if "our conviction is sure that the error did not influence the jury or had but slight effect"); *United*

*States v. Martin,* 567 F.2d 849, 854 (9th Cir.1977). The harmless error rule was recognized by this Court in *United States v. Hatcher,* 680 F.2d 438, 442 (6th Cir. 1982). In *Hatcher,* we held that the harmless error rule is to be applied "with great caution" and "only where the unrelated charge and the evidence supporting that charge is such an inconsequential part of the joint indictment that no possible harm from the misjoinder could reasonably have occurred." *Id.* The misjoinder is not harmless "if the extent of the proof [of the misjoined charges] is significantly greater than that reasonably used to demonstrate other crimes or if focus of the trial is shifted away from proof of the properly joined offense[s]." *Id.*

We have examined both the indictment and the trial transcript to determine if any possible harm could reasonably have occurred from the misjoinder of tax Counts 18–20. Our survey revealed the following: (1) Counts 18–20 comprised less than two full pages of the thirty-page indictment; (2) approximately sixty pages of the 2,450-page trial transcript directly related to testimony about tax reporting of attorney's fees deductions; (3) of forty-five witnesses in the case, only four testified with reference to Counts 18–20. From the above, it is readily apparent that Counts 18–20 did not play a central part in this case.

Moreover, there are additional factors present in this case which make it highly unlikely that any of the defendants were actually harmed by the misjoinder. First and foremost, Gillock was actually *acquitted* on the misjoined charges. This acquittal shows two things: (1) Gillock was not prejudiced with respect to the misjoined charges themselves; and (2) neither he nor the other defendants were prejudiced with respect to the other charges because prejudice will not result from accusations not believed. The second conclusion assumes, of course, that the jury actually believed that the acquitted charges were not true. An analysis of the evidence shows that assumption to be a reasonable one. The evidence on Counts 18–20 was equivocal at best. Gillock was entitled to deduct the attorney's fees which he claimed, just not in the particular years in which he claimed them. Gillock testified that he relied on his secretary and his accountant to make sure that the deductions were allocated to the appropriate years. He said he did not pay close attention to the details of his return. Under these circumstances, there was considerable doubt that Gillock had the necessary criminal intent, and the jury acquitted. By contrast, on Count 17, where the evidence was strong—Gillock admitted receiving the money, admitted it was not a gift, and admitted not reporting it—the jury convicted.

Finally, we note that the nature of the misjoined charges greatly reduced the likelihood of prejudice with respect to Bibby and Ayers. Tax offenses, like taxes, are very discreet, very individualistic matters. The evidence necessary to prove them is readily distinguishable from that necessary to prove other offenses. They are peculiarly a matter between a taxpayer and his government. Accordingly, it is most improbable that a jury would allow alleged indiscretions on Gillock's tax return to influence their deliberations on the guilt or innocence of Bibby and Ayers on other, non-tax matters.

For all of these reasons, then, the minor role played at trial, the jury's acquittal, and the nature of the charges involved, we conclude that the misjoinder of Counts 18–20 in this indictment and trial was harmless error as to all three defendants.

Bibby and Ayers also make a misjoinder claim based on Rule 14 of the Federal Rules of Criminal Procedure. Rule 14 allows a trial judge to order separate trials for defendants joined in the same indictment if he believes a joint trial would be prejudicial to the defendants. Bibby and Ayers argue that their trials should have been severed from Gillock's as to all the counts because the case against Gillock was so much stronger, because Gillock's testimony at the trial was so inflammatory, and because there was so much adverse pretrial publicity about Gillock.

■ The severance decision under Rule 14 is generally left to the sound discretion of the trial judge and will not be reversed absent a showing of abuse of that discretion. *United States v. Whitley*, 734 F.2d 1129, 1139 (6th Cir. May 2, 1984); *United States v. Goldfarb*, 643 F.2d 422, 434 (6th Cir.), *cert. denied*, 454 U.S. 827, 102 S.Ct. 118, 70 L.Ed.2d 101 (1981). The defendant carries a heavy burden requiring him to make a strong showing of prejudice before a reversal will be granted. *United States v. Davis*, 707 F.2d 880, 883 (6th Cir.1983). Bibby and Ayers have failed to carry that burden. Their allegation of adverse pretrial publicity is just that, only an allegation. They offer no supporting evidence. Their assertion that the evidence against Gillock was strong and the evidence against them was weak is simply wrong. As to their claim about Gillock's inflammatory references to his prior appearances in court, these statements, while unfortunate, were not sufficiently prejudicial to require a severance. Accordingly, we find that the trial judge did not abuse his discretion in refusing to order separate trials.

Defendants next argue that the indictment alleged a single conspiracy when there were, in fact, multiple conspiracies. If the defendants are correct in this assertion, and they can prove that they were prejudiced by this variance between the indictment and the proof, they are entitled to a reversal of their convictions. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Warner*, 690 F.2d 545, 548 (6th Cir.1982). The defendants argue that the government actually established three separate conspiracies. The first conspiracy was the scheme to pay Gillock $4,000 for his help in obtaining the Tennessee Department of Employment Security contract. The second conspiracy was the profit-splitting agreement between Camarda, Bibby and Ayers. The third conspiracy involved the payments to Gillock for his help in the Shelby County transaction. According to the defendants, each conspiracy had a separate objective and a distinct cast of characters. The defendants contend that to include them all in a single conspiracy count and to charge, as the trial judge did, that the jury must find each defendant guilty of one single conspiracy or none at all, was wrong and highly prejudicial to each defendant.

■ We agree that there was more than one conspiracy shown, but we do not agree that all the defendants were prejudiced thereby. The main conspiracy here was a conspiracy to defraud Honeywell of the honest, loyal and faithful performance of its employees. The core of this conspiracy was the arrangement between Bibby, Ayers and Camarda to split the profits on Honeywell computer sales financed by Camarda's company. The Shelby County transaction, in which Gillock received $150,000, and which formed the basis of the fraud counts against all three defendants, was only one of many transactions in which Bibby and Ayers skimmed off profits as a result of their agreement with Camarda. However, the conspiracy involving payments to Gillock for his help in securing the Tennessee Department of Employment Security contract was not part of this overall plan. The evidence shows that after Gillock was paid, there were no further contacts between Gillock and Honeywell employees for two years. Any conspiracy that had existed had expired long before Gillock was recruited to work on the Shelby County contract.

Nonetheless, we find that neither Bibby nor Ayers was prejudiced by this discrepancy between the indictment and the proof. All of the evidence of the State of Tennessee conspiracy would have been admissible in a separate conspiracy trial involving only the Bibby/Ayers/Camarda profit-splitting agreement and the Shelby County contract. It would be relevant to show the extent of the prior relationship between Gillock and Honeywell and to show the manner in which Honeywell employees had used indirect payment vehicles in the past to compensate Gillock because direct payment was against company policy. It would also be relevant to show that Gillock knew the payments from Honeywell were improper

because of the clandestine nature in which they were always made. Accordingly, we find no prejudice in the joining together of two conspiracies in a single indictment.

■■■ Given our characterization of the central conspiracy, however, the question arises whether Gillock was ever really a part of it. The record does not show any evidence that Gillock ever knew about the profit-splitting agreement between Camarda, Bibby and Ayers. An essential part of any conspiracy conviction is a showing that a particular defendant knew of and adopted the conspiracy's main objective. *See, e.g., United States v. Smith,* 700 F.2d 627, 632 (11th Cir.1983). The evidence did establish Gillock's participation in a smaller conspiracy, the one involving only the Shelby County contract. Nevertheless, his conspiracy conviction cannot stand because he was prejudiced by the variance between the indictment and the proof. A substantial amount of evidence was introduced at trial detailing the Bibby/Ayers/Camarda profit-splitting arrangement, evidence that would not have been admissible in a separate trial on the Shelby County contract alone. Accordingly, the conspiracy conviction against Gillock must be reversed.

■■■ It does not follow, however, that Gillock's mail and wire fraud convictions, because based on the same factual framework as the conspiracy charge, must also be reversed. The elements of the two offenses are different:

> The predicate for liability for conspiracy is an agreement, and a defendant is punished for his membership in that agreement. Mail ... fraud, on the other hand, punishes the *act* of using the mails ... to further a scheme to defraud. No agreement is necessary .... [A defendant] is liable for mail fraud as a principal or as an aider and abettor, not a conspirator. As an aider or abettor, [a defendant] need not agree to the scheme. He need only associate himself with the criminal venture and participate in it.

*United States v. Read,* 658 F.2d 1225, 1240 (7th Cir.1981). Accordingly, it is not necessary that Gillock have been aware of all

aspects of the scheme in order to be guilty of fraud. All that must be shown is that Gillock's conduct aided the execution of the scheme. That much the government did establish.

The defendants also make several evidentiary claims. First, defendant Gillock argues that the district judge failed to make the necessary findings as required by *United States v. Enright,* 579 F.2d 980, 986 (6th Cir.1978), before admitting coconspirator hearsay statements pursuant to Federal Rule of Evidence 801(d)(2)(E). Following oral argument and after reviewing the record, we recognized that Gillock's assertion was correct, and we remanded the case to district court, pursuant to *United States v. Holloway,* 731 F.2d 378 (6th Cir.1984), for that court to make the *Enright* finding. Upon remand, the district judge, after a lengthy and comprehensive hearing, found that all hearsay evidence was properly admitted under *Enright.*

■■■ The district judge, however, based his *Enright* finding on the view that only one conspiracy existed, and as we have discussed, there were multiple conspiracies in this case. Although we usually would remand the case to the district judge to make further findings consistent with our conclusion, we feel that in this case, where we are already well acquainted with the record and where the district court has supplied us with extensive factual findings following a hearing, we can adequately evaluate whether the hearsay evidence was properly admitted. *See United States v. Holloway,* 731 F.2d at 382. Based on our own review of the record, we conclude that any hearsay evidence was properly admitted under Federal Rule of Evidence 807(d)(2)(E). We therefore find no reversible error on this claim.

■■■ The defendants next argue that the trial judge erred in not requiring the government to produce the Internal Revenue Service's tax audit of Jack Camarda. According to them, this tax audit could have provided them with valuable impeachment evidence because it could have estab-

lished a motive for Camarda to falsify his testimony. Kickbacks of the type Camarda described in his profit-sharing agreement with Bibby and Ayers are deductible tax items. In general, a prosecutor is required, upon request, to give a defendant any exculpatory information the prosecutor may have which is material to guilt or innocence. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The *Brady* requirement has been extended to include evidence tending to impeach a government witness. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, the *Brady* requirement only applies to evidence which the prosecutor knew or should have known was exculpatory. *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). Moreover, *Brady* does not apply to evidence not in the prosecutor's possession. *See United States v. Escobar,* 674 F.2d 469, 479 (5th Cir.1982); *United States v. Hutcher,* 622 F.2d 1083, 1088 (2d Cir.), *cert denied,* 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980). The purpose of *Brady* and its progeny is not to require the prosecutor to search out exculpatory evidence but rather to divulge whatever exculpatory evidence he already has. When, as here, the record shows that the prosecutor had never seen the tax audit, never had it in his possession, and did not know what it contained, *Brady* does not require that he obtain it and give it to the defense. If the defendants wanted the tax audit, the proper course was to seek it from the IRS itself.

Bibby and Ayers also argue that the trial judge should have required, pursuant to Federal Rule of Criminal Procedure 17(c), that Camarda produce certain documents he used to calculate his kickback payments to Bibby and Ayers. Camarda did produce one set of documents pursuant to a Rule 17(c) subpoena, but they did not turn out to be what Bibby and Ayers wanted. Accordingly, during the middle of the trial, they asked the trial judge to issue another subpoena for additional documents. At the hearing on their request, Camarda's attorney reported that this second subpoena covered over 4,500 pages of documents and still would not produce what the defendants were after. The trial judge declined to issue the second subpoena on the ground that it was excessively burdensome and would serve no purpose.

 Once again, our review of the trial judge's decision is limited to determining whether he has abused his discretion in declining to issue the subpoena. *United States v. Nixon,* 418 U.S. 683, 702, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974); *United States v. Florea,* 541 F.2d 568, 574 (6th Cir.1976), *cert. denied,* 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977). We find that he did not. The record shows that defendants were allowed extensive discovery of Camarda and were provided with numerous documents. The record further shows that defendants would not be able to accomplish that which they wished to accomplish with the subpoena and that compliance with the subpoena would indeed be burdensome. Accordingly, the decision to deny the subpoena was not error. .

 Moving to the substantive issues in the case, all the defendants argue that there was insufficient evidence to find them guilty of attempting to defraud or actually defrauding, by mail or wire, anyone or anything. In order to establish a violation of the mail fraud statute, 18 U.S.C. § 1341, the government must prove both (1) a scheme to defraud, and (2) a mailing for the purpose of executing the scheme. *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. Strong,* 702 F.2d 97, 100 (6th Cir.1983). The "scheme to defraud" element has been defined by this Court to be "a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *United States v. Van Dyke,* 605 F.2d 220, 225 (6th Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979). The mailing requirement is satisfied when use of the mails is a reasonably foreseeable consequence of the scheme to defraud. *Pereira,* 347 U.S. at

8–9, 74 S.Ct. at 362–363; *United States v. Calandrella*, 605 F.2d 236, 253 (6th Cir.), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). A violation of the wire fraud statute, 18 U.S.C. § 1343, requires a showing of essentially the same things, the only difference being that a wire communication, e.g., telephone call, is required instead of a mailing. *See United States v. Lemire*, 720 F.2d 1327, 1334–35 (D.C.Cir. 1983); *United States v. Morelli*, 643 F.2d 402, 412 (6th Cir.), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981); *United States v. Conte*, 349 F.2d 304, 306 (6th Cir.), *cert. denied*, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965).

■ The defendants argue that there was no fraud because all of the parties involved in the Shelby County transaction, the sale that formed the basis of the fraud counts, benefited from a good bargain. Honeywell's sale price was well within the range of its allowable discount. Shelby County paid much less than the retail sales price. And any money that went to the defendants came out of Camarda's pocket, not Honeywell's or Shelby County's. Finally, payments that were made to Gillock were a necessary business expense to enable the transaction to succeed.

The defendants' logic is not convincing. The fact remains that had Gillock not received his $150,000 fee, had Bibby and Ayers not pocketed $18,000 each, the sales price would have been even lower. And if Honeywell and Shelby County had known about these kickbacks and commissions, which were directly contrary to Honeywell policy, they would certainly have felt defrauded. It is simply not possible to characterize this entire transaction as "a reflection of fair play and right dealing in the general and business life of society."

A case from the Seventh Circuit, *United States v. George*, 477 F.2d 508 (7th Cir.), *cert. denied*, 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (1973), supports our conclusion that defendants' conduct is actionable under the fraud statutes. In *George*, a buyer for Zenith Corporation bought television cabinets from a company whose president happened to be a friend of his. In exchange for the business, the friend gave the Zenith buyer substantial kickbacks on the purchase price. Both the buyer, the seller, and a third-party intermediary were found guilty of mail fraud. At the time, Zenith had in effect a conflict of interests policy forbidding this type of conduct by its employees. Our situation is very similar. Bibby and Ayers are the sellers receiving the kickbacks. Camarda, as financier, takes the place of the buyer who pays the kickback. And Honeywell has a conflict-of-interests policy which prohibits these kinds of payments. Therefore, because the six $3,000 payments to Gillock were a necessary part of the overall scheme and a reasonably foreseeable consequence thereof, Bibby and Ayers were properly convicted on six counts of mail fraud.

■ Gillock agrees that *George* may be controlling as to Bibby and Ayers but not as to himself. He argues that there was no evidence that he intended to deprive Honeywell of the loyal and faithful services of its employees or that he was aware that there was anything wrong with his acceptance of fees from Honeywell for his services. He claims not to have known about Honeywell's policy prohibiting payments to public officials. Nevertheless, Gillock's manner of receiving what he claims to have been legitimate commissions and fees contradicts his contention that he acted innocently. The six $3,000 payments (Counts 2–5, 7, 8) all came from Manmark, Inc., a company in no way associated with Honeywell. His $4,000 payoff for the State of Tennessee sale was funneled through yet another unaffiliated corporation, Public Services, Inc. Finally, his $130,365.51 commission on the Shelby County contract came from Camarda and was paid, at Gillock's request, to Gillock's friend, Mr. Forsythe. Moreover, before being paid for his work on the State of Tennessee project, he was told by Jack Owen that there was no way that Honeywell could pay him directly for his services. All of this combines to make it highly unlikely that Gillock did not know he was being paid money by Honey-

well to which he was not entitled. The issue of fraudulent intent under section 1341 is for the jury, *see United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979), and we find that a reasonable juror could have concluded from the available evidence that Gillock's receipt of the monies at issue was fraudulent.

The analysis regarding the wire fraud counts is essentially the same. Here, however, there is some question concerning the validity of Count 6, the count involving a phone call between Jack Camarda and Gillock on August 29, 1978. The government's proof established that such a call was made but it did not establish what was said during that call. Camarda could not remember. As a result, the government did not show that the call was "for the purpose of executing the scheme." Accordingly, the conviction of all three defendants on Count 6 must be reversed. The other wire fraud charge, Count 9, involving the phone call from Gillock to Drew on October 19, 1978 to arrange for the payment of Gillock's commission on the Shelby County deal, is supported by the evidence and so must be affirmed.

Gillock also contends that his conviction for violation of the Hobbs Act, 18 U.S.C. § 1951, for accepting the $130,365.51 commission should be reversed. The Hobbs Act makes it illegal to "affect commerce ... by extortion," extortion being defined as, among other things, "the obtaining of property from another, with his consent, .... under color of official right." Gillock argues that his receipt of the $130,000 was not "under color of official right" because he lacked either actual or apparent authority to authorize computer purchases by either the State of Tennessee or Shelby County. He relies heavily on the Eighth Circuit case of *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75

(1979), to support his position. In *Rabbitt*, the court held that it was not a violation of the Hobbs Act for a Missouri state representative to use his influence and connections to help an architectural firm win contracts from the State of Missouri in exchange for ten percent commission on the contracts so awarded. The state representative had no direct control over the award of such contracts.

This Court has held that a state official's acceptance of money violates the Hobbs Act "so long as the motivation for the payment focuses on the recipient's office." *United States v. Harding*, 563 F.2d 299, 307 (6th Cir.1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978) (quoting *United States v. Braasch*, 505 F.2d 139, 151 (7th Cir.1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975)).[1] What matters is not whether the official has "actual *de jure* power to secure" the desired item, but whether the person paying him "held, and defendant exploited, a reasonable belief that the state system so operated that the power in fact of defendant's office included the authority to determine recipients of the [contracts] here involved." *United States v. Mazzei*, 521 F.2d 639, 643 (3d Cir.) (en banc), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975).

The factual setting in the *Mazzei* case closely parallels our own. The defendant was a Pennsylvania state senator. The senator helped persuade a state executive agency over which he had no statutory power to locate an office in a particular building. In exchange for this assistance, the building's owner paid the senator ten percent of the gross value of the lease. This was found to violate the Hobbs Act. The only difference between that case and our own is a matter of degree. The Pennsylvania state senator's effective control over the leasing decisions of

---

1. Obviously, this rule cannot be applied literally. Otherwise any political contribution could conceivably provide the basis for a Hobbs Act charge. What the Hobbs Act proscribes is the taking of money by a public official in exchange for *specific* promises to do or refrain from doing *specific* things. *See United States v. Dozier*, 672 F.2d 531, 537 (5th Cir.), *cert. denied*, 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982). In other words, there must be a *quid pro quo.*

the state agency may have been somewhat stronger than Gillock's over Shelby County's contracting decisions. Nevertheless, we believe that Gillock's past performance on the State of Tennessee contract, combined with his assurances to Oliver Drew that he had "influence in Shelby County," were sufficient to create a reasonable belief that he could deliver the goods. That is sufficient to trigger the provisions of the Hobbs Act. In our view, it is not essential that a state official be able to guarantee a certain result before his acceptance of money to bring about that result will run afoul of the law. Reasonable prospects of success are sufficient. Indeed, if the facts of this case required it, we would be inclined to say that any attempt by a public official to sell his influence over others runs afoul of the Hobbs Act. Political influence is not a commodity to be bought and sold on the open market. Gillock's attempts to do just that cannot be squared with the plain meaning of the statute which prohibits the taking of money "under color of official right." As we stated before, there is a violation "so long as the motivation for the payment focuses on the recipient's office." *Harding*, 563 F.2d at 307.

Finally, Gillock argues that the district court erred in refusing to include a gift theory defense in the jury instruction and that the district judge was prejudiced against him. Based on our review of the record, we find these claims to be without merit.

Accordingly, the decision of the district court is affirmed except for the convictions on Count 6, which are reversed for lack of sufficient evidence, and Gillock's conviction on the conspiracy count. However, because these reversals do not affect the defendants' sentences, those sentences are affirmed in their entirety.