UNITED STATES of America,
Plaintiff-Appellee,

v.

Allen C. LAWSON (84–3798), David W.
Luke (84–3799), and, Paula Luke
(84–3800), Defendants-Appellants.

Nos. 84–3798 to 84–3800.

United States Court of Appeals,
Sixth Circuit.

Oct. 16, 1985.

Frost & Jacobs, John C. Greiner, argued, Court appointed, Cincinnati, Ohio, Louis I. Hoffman, argued, Dennis A. Lieberman, argued, Flanagan, Lieberman, Hoffman, & Swain, Dayton, Ohio, for defendants-appellants.

Anthony Nyktas, Asst. U.S. Atty., Kathleen M. Brinkman, Asst. U.S. Atty., Terry Lehmann, argued, Cincinnati, Ohio, for plaintiff-appellee.

Before LIVELY, Chief Judge, CONTIE and WELLFORD, Circuit Judges.

PER CURIAM.

Defendants Allen Lawson, David Luke, and Paula Luke appeal from their July, 1984 jury convictions in the Southern District of Ohio.

All were charged in Count I of conspiracy involving transportation in interstate commerce, and receipt and disposition of stolen property under 18 U.S.C. § 371. Lawson was charged in Count 2 of interstate transportation of stolen property under 18 U.S.C. § 2314. Luke was charged in Count 3 of receipt of stolen property that had been transported interstate under 18 U.S.C. § 2315. Each was found guilty as charged. Co-defendant Milford Barger pleaded guilty to Count 1 prior to trial. Co-defendant Darrell Robbins was acquitted, however, on Counts 1 and 3. Charges against two other co-defendants Thomas Caffey and Gary Ketcher were dismissed in favor of state prosecution.

Prior to trial the district court ruled against defendants on their motions to dismiss the indictment for pre-indictment delay, misjoinder, severance, and to suppress conversations recorded during court-ordered electronic surveillance. Those actions are the subject of this appeal.

At approximately 2:30 a.m. on September 23, 1983, police officers apprehended David Luke and Allen Lawson at the Holiday Inn in Sharonville, a Cincinnati, Ohio suburb. Luke and Lawson were in possession of stolen jewelry with a retail value of approximately $950,000, which had been taken during an armed robbery in Nashville, Tennessee, the previous day by Caffey and Ketcher, escapees from an Oklahoma prison. Caffey, Ketcher and Lawson met with Luke in room 5232 at the Holiday Inn. Also present were Milford Barger, a Hamilton, Ohio fence, and his associate, Darrell Robbins.

After everyone else had gathered that night Lawson called Luke in his home in Dayton, Ohio. Luke arrived about 1:00 a.m. in the morning with jewelry examining equipment including a gem scale, AD Leveridge Gauge, and an eyepiece or jeweler's loop. Luke proceeded to examine the jewelry to approximate its value.

As a number of confederates left the motel room for beer and to check on others

previously departed, police arrested them. Police finally entered room 5232 and arrested Lawson, Luke, and Caffey, recovering most of the jewelry which had been taken in the robbery, much of which still had tags attached from the victim store. The police seized also Luke's jeweler loop, AD Leveridge Gauge, gem scale, calculator, and handwritten notes.

For a number of years the FBI and local law enforcement officials had suspected Luke and his wife, Paula, of being "fences" for stolen property. They operated together an antique shop, "David's Antiques," next to Paula's hair styling salon "Athena Hair Fashions" just outside Dayton. During 1979 and 1980, the Lukes began buying gold and silver items in bulk quantities by weight, and during that time David Luke began buying property from Lawson, a resident of Tennessee.

To confirm their suspicions that the Lukes were fencing stolen property, the FBI made two undercover sales to David Luke. On March 12, 1980, an FBI undercover agent, accompanied by a cooperating informant, sold David Luke sterling silver flatware for $1,044.00. Immediately after the undercover agent left David's Antiques, two FBI agents entered the store. When questioned about the transaction in which the undercover agent had sold the sterling silver flatware, David Luke insisted that he had made no such purchase.

On May 5, 1980, a local Ohio police department official, Detective James Malott, working with the FBI on its investigation, dressed as a biker and offered to sell David Luke sterling silver flatware and other pieces. Malott told Luke that the items were "hot" but taken from out of state. Thus Luke did not have to worry if he got rid of them in Dayton. David Luke then paid Detective Malott $925.00 for the items. Another witness at trial, Michael Hockett, testified that he had sold stolen property to David Luke on approximately twelve occasions in 1980 and 1981. Hockett told Luke that the items were stolen. He estimated that Luke paid him a total of $75,000.

From August 23, 1982 to October 19, 1982, a court-ordered telephone wiretap was in effect on three business lines at David's Antiques and Athena Hair Fashions and on one line at the residence of David and Paula Luke. Also, pursuant to the court order, the police placed a microphone in the upstairs office at David's Antiques to monitor conversations. The investigators conducted visual surveillance of David and Paula Luke, Lawson, and others during the period of electronic surveillance. During the trial, the government presented to the jury forty-two taped conversations and related visual surveillance evidence from this period.

The tapes revealed the Lukes' management of a fencing operation for stolen gold and silver items, jewelry, and other goods as an adjunct to their legitimate business. During one of these taped conversations, on August 30, 1982, David Luke discussed with Jimmy Dale Barker the possibility of Luke's buying a new watch or watches, with a price tag of $51,000, for 10% or less. The thieves wanted $15,000 for the items but Barker and Luke agreed that it was "not a good deal." Detective Malott explained that fences and thieves make it a rule of thumb that a fence will pay only approximately 10% of the true value of stolen property.

Lawson sold stolen property to the Lukes frequently during the period of surveillance. Around the first part of October 1982, Paula Luke took more direct day-to-day control of the operation because David Luke went to gemology school in New York. She continued to do business with Lawson. She honored Lawson's request to meet at locations other than David's Antiques due to his fear that the business was being watched by the police.

The court-ordered surveillance of the Lukes ended in October 1982—some eleven months before Lawson and Luke were arrested. On the last day of the court-ordered surveillance, the Lukes and Lawson had one of many intercepted conversations. Paula Luke called David Luke in New York and told him of Lawson's request to speak

to him immediately. David Luke told his wife, "I better go down somewhere else and call him." David Luke asked, "Is he alarmed ...?" Paula Luke responded, "He seemed concerned. Very concerned and it seemed rather urgent.... I hope it doesn't involve us.... But there's a possibility it might.... Maybe, this may be a warning or something. You know?"

**ISSUE 1: Did the Trial Court Err in Refusing to Suppress Evidence Obtained by Wiretapping?**

**A.** *Was the Electronic Surveillance Lawfully Authorized?*

■ The Lukes argue that there was a fatal lapse in authorization for the wiretapping under 18 U.S.C. § 2517. By the 1981 order of then Attorney General Civiletti, the Assistant Attorney General of the Criminal Division in the Department of Justice, was authorized to approve wiretap applications. The approval of the Luke wiretapping was given two years later by the succeeding Assistant Attorney General in the Reagan administration (Lowell Jensen). The Lukes argue that the authorization lapsed either when Reagan Attorney General William French Smith replaced Civiletti or after a "reasonable time" thereafter, and that two years was far more than a reasonable period.

This automatic lapse argument due to change in the persons occupying the office of Attorney General or the Head of the Criminal Division of the Justice Department has been made in several other cases. *See, e.g., United States v. Kerr,* 711 F.2d 149, 151 (10th Cir.1983); *United States v. Terry,* 702 F.2d 299, 311 (2d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Messersmith,* 692 F.2d 1315, 1316–17 (11th Cir. 1982); *United States v. Wyder,* 674 F.2d 224, 226–27 (4th Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982). In *Kerr,* the Tenth Circuit specifically held that there is no "express [time] limitations nor language from which one could be implied." 711 F.2d at 151. The authorization in *Kerr* extended for more than two years. The only difference there

was that the Assistant Attorney General (Philip Heymann) stayed on while Attorney General Civiletti replaced Griffin Bell as United States Attorney General. The other cases cited likewise rejected this argument made by the Lukes. We agree with the clear weight of the case law and find no merit in this argument. The district court was not in error in concluding that the electronic surveillance was lawfully authorized.

**B.** *Did the Government Sufficiently Minimize Electronic Surveillance in Accordance with the Wiretapping Authorization?*

■ Paula Luke first emphasizes that the government's initial wiretapping application for a period of thirty days lacked "probable cause" as to her criminal involvement in the fencing operations. Thus Paula argues that because she was not a named interceptee in the order, electronic surveillance of her conversations should not have taken place, and that her conversations should have been suppressed. The later probable cause supporting the application for a second thirty days of electronic surveillance was therefore based on the poisonous fruit of the first electronic search which she claims was unlawful.

That order, however, did not specify that conversations involving other than named interceptees should cease immediately. The order, in pertinent part, stated:

All interceptions will be minimized in accordance with Chapter 119 of Title 18, United States Code. Interception *will be suspended immediately* when it is determined through voice identification, physical surveillance or otherwise that none of the named interceptees or any of their confederates, when identified, are participants in the conversation *unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.*

(Emphasis added). The government's wiretap application, moreover, listed Paula Luke as one of those persons who the government had insufficient probable

cause but still had "reason to believe" was "involved in violation of the statute set forth." Paula Luke, moreover, specifically mentions as invalid only one conversation during the first thirty day surveillance period and she cannot avoid the fact that it was criminal in nature.

There is clear case law support for such a wiretapping authorization flexible in its import. In *United States v. Kahn*, 415 U.S. 143, 158, 94 S.Ct. 977, 985, 39 L.Ed.2d 225 (1974), the Supreme Court held that the interception of criminal conversation between two persons not named in an otherwise appropriate wiretapping order is not a violation of the Fourth Amendment. Also in *United States v. Donovan*, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977), the Court also indicated that violation of the statutory identification requirements did not mandate suppression of an otherwise properly executed order under the Fourth Amendment. We find Paula Luke's contention in this regard unpersuasive.

■ Both Paula and David Luke complain that there was insufficient minimization of conversation surveillance during the entire period. The Lukes presented 117 of 9,000 interceptions as "samples" regarding the lack of minimization. Yet, as stated in *United States v. Dorfman*, 542 F.Supp. 345, 391 (N.D.Ill.), *aff'd in part and rev'd in part on other grounds*, 690 F.2d 1217, 1230 (7th Cir.1982),

> It is not enough for the defendants to identify particular calls which they contend should not have been intercepted; they must establish a pattern of interception of innocent conversations which developed over the period of the wiretap.

The Lukes simply present no such *prima facie pattern* of abuse. Accordingly, the district judge's overruling of the suppression motion finding this argument "untenable" is not erroneous.

■ Without raising the argument as a specific issue, the Lukes also complain that the same judge, Rubin, who originally authorized the wiretap should not have made the suppression decision. We have overruled this contention in other cases. *See*

*United States v. Murray*, 762 F.2d 1013 (6th Cir.1985), and *Southerland v. Irons*, 628 F.2d 978 (6th Cir.1980) (knowledge gained from previous proceedings not usually grounds for judge's recusal). We sustain, therefore, the action of the district court in respect of the suppression motion.

**ISSUE 2: Did the Trial Court Impermissibly Limit Cross-Examination?**

■ The trial judge limited impeachment or "background" cross-examination only in respect to denying duplicative questioning by each defense attorney. Denying repititious cross-examination by all defense attorneys was not an abuse of the court's discretion. The Lukes fail to cite any case law establishing that this action violated some *per se* rule or specifically prejudiced them here in this case. We find no error warranting a setting aside of the verdicts on this ground.

**ISSUE 3: Was it Reversible Error to Admit the Luke Telephone Toll Records, A Summary Chart of Calls, and Related Testimony?**

■ Defendants assert that the South Central Bell telephone records fail to fit under the "business records" exception under Fed.R. of Evid. 803(6) to the hearsay rule due to lack of adequate proof. The South Central Bell representative who testified admitted that he personally had never examined the exact records produced before. He was able to state that such records are kept and maintained in the normal course of business.

We find, however, that there was independent evidence to identify the genuine nature of these records. The telephone records of the Lukes were introduced into evidence indicating various calls to and from Lawson's residence telephone in Tennessee to the Lukes' number or numbers. In a tape-recorded conversation, Lawson confirmed his phone number and address to Luke conforming to that indicated in the disputed records. Introduction of such independent evidence, moreover, establishes that the records, chart, and related testimo-

ny in dispute were not crucial elements of evidence upon which the verdict hinged. Thus, even if admitted without adequate background identification by the telephone company official, the admission was harmless error at most, and is no basis for reversal.

## ISSUE 4: Was the Evidence of Interstate Transportation Sufficient as to Paula Luke?

Paula Luke does not argue that the evidence is insufficient to convict her of a conspiracy. She argues that she cannot under the evidence adduced be found guilty of a conspiracy *involving interstate transportation* of stolen property, since she was not present at the Holiday Inn when the stolen goods from Tennessee were being appraised for exchange. The indictment, however, clearly charges Paula Luke as involved with her husband in a wide-ranging conspiratorial enterprise to fence stolen property. She dealt with Lawson, a known resident of Tennessee, frequently regarding stolen property during the period in question.

Paula Luke is attempting to make the "interstate" element of the offense equivalent to a *mens rea* requirement.

> One who knowingly receives stolen chattels must do so at the peril of their having been stolen while in course of interstate transportation; indeed it is not perceived why the thief should escape conviction under this statute just because he did not know the points of origin and destination. Manifestly both the receiver and the thief are chargeable with knowledge of the act of Congress forbidding this particular theft, quite as certainly as they are of a state statute prohibiting theft generally. The status of the articles, in the sense of being interstate or intrastate in character, cannot in the nature of things affect the fact either of the stealing or receiving alleged; and the statute, whether federal or state, is at bottom aimed against stealing or receiving.

*Kasle v. United States*, 233 F. 878, 882 (6th Cir.1916). *See also United States v.*

*White*, 451 F.2d 559, 560 (6th Cir.1971), *cert. denied*, 405 U.S. 1071, 92 S.Ct. 1522, 31 L.Ed.2d 804 (1972). In light of this authority, Paula Luke's argument must fail.

■ One who engages in a conspiratorial operation to receive and acquire stolen property must also "do so at the peril of their having been stolen while in course of interstate transportation." *Kasle*, 233 F.2d at 882. *See also United States v. Garafola*, 471 F.2d 291 (6th Cir.1972); *United States v. Cimini*, 427 F.2d 129 (6th Cir.), *cert. denied*, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970). Paula Luke's absence from the Holiday Inn and a lack of direct proof of her specific knowledge about the interstate nature of the transaction of the stolen jewelry seized would not prevent a reasonable trier of fact from concluding from the other proof in the case that Paula Luke was part of the unlawful conspiracy charged.

## ISSUE 5: Should Defendants have been Discharged Due to Preindictment Delay?

■ The trial court correctly rejected the Lukes' argument in this respect. The Lukes contend that their "speedy trial" rights protected under the Sixth Amendment were violated. *See Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). This case, however, involves only *preindictment* delay and thus does *not* implicate the "speedy trial" Act, which is triggered only *after* indictment.

■ The Lukes were not indicted until 1984 based on evidence of felonies which occurred as far back as 1980. For preindictment delay violative of due process rights, however, the Lukes would have to show (1) prejudice to their case and (2) intentional government delay to gain an advantage. *See United States v. Marion*, 404 U.S. 307, 325–26, 92 S.Ct. 455, 465–66, 30 L.Ed.2d 468 (1971); *see also United States v. Brown*, 667 F.2d 566, 568 (6th Cir.1982). The Lukes actually take the view that proof of *intentional* government delay is not necessary. The defendants provide no evidence of the required ele-

ment, they fail to demonstrate prejudice, and there is no other showing which would warrant relief on this ground.

### ISSUE 6: Should the Trial Court have Overruled the Luke Objection to a Claimed "Willful Ignorance" Jury Instruction?

 In its instructions to the jury, the court charged:

The word knowingly is used in the indictment. The word knowingly means that a defendant realized what he was doing and was aware of the nature of his conduct. It means that he did not act through ignorance, mistake or accident. Knowledge may be proved by the defendant's conduct and by all the facts and circumstances surrounding the case.

We find this to be a fair statement of the law. In addition, the court later charged the jury, over defense counsels' objections, that:

An element of knowledge may be inferred from proof that a defendant deliberately closed his eyes to what would otherwise be obvious. The knowledge requirement may be satisfied also if you find from the evidence beyond a reasonable doubt that a defendant acted with a conscious purpose to avoid learning the truth.

The Lukes claim this latter instruction is the same as a negligence concept of "willful ignorance." Under the circumstances we find the objection was not well taken. The court did not by using the challenged supplementary language lessen the burden placed on the government to prove the necessary elements of the offense beyond a reasonable doubt.

### ISSUE 7: Was it Error to Permit the Evidence of Cocaine at the Time of Arrest?

 Early in the trial the government tried to show, through the testimony of an expert witness, that certain substances found in a defendant's car on the night he was arrested were in fact narcotics. The court, however, did not allow this testimony as to the nature of these substances at this juncture because of its potentially prejudicial effect. At the end of the government's case-in-chief, however, the court did allow the expert to identify a substance found in the Holiday Inn room at the time of arrest as cocaine. The admission of this evidence was within the court's discretion under Fed.R.Evid. 403 after weighing the potential prejudice. It was admissible under Fed.R.Evid. 404(b) exception as contemporaneous evidence of "other crimes." There was evidence that the plan involved at the time for at least one co-conspirator (Robbins) to exchange cocaine for stolen jewelry. Thus, we find no merit to defendants contention.

### ISSUE 8: Was it Error to Permit Police Officers to Give Opinions About the Codewords and Practices of Fence Operations?

 The Lukes specifically object to the definition of such words as "score" and "spot price" by testifying police officers. This court, however, in *Woods v. United States*, 568 F.2d 509, 514 (6th Cir.), *cert. denied*, 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 64 (1978) supports allowing such testimony. In that case a police officer was allowed to testify about the vocabulary and practices of the criminal drug culture. *See also United States v. Barker*, 553 F.2d 1013, 1024 (6th Cir.1977) (general experience can qualify witness as expert). In this case, similarly, it was not error for experienced police officers to convey their knowledge as experts in the field to the trier of fact.

### ISSUE 9: Should Supplemental Instructions have been Given the Jury on Aiding and Abetting?

David Luke argues that the court's instruction was insufficient in explaining the required elements for conviction under an "aiding and abetting" theory for the substantive offense of receiving stolen property (Count 3). Luke asserts that the key unclear element was intent to facilitate the commission of a crime. The court's instruction was as follows:

In count three, defendants David W. Luke and Darrell Robbins are charged with aiding and abetting the receipt of stolen property in a value of five thousand dollars or more which had been transported in interstate commerce. Section 2 of Title 18 provides in part as follows. Whoever commits an offense against the United States or aids, abets, induces or procures its commission is punishable as a principal.

Whoever wilfully causes an act to be done which, if directly performed by him or another, would be an offense against the United States is punishable as a principal.

There are two essential elements, each required to be proved beyond a reasonable doubt in order to establish the offense known as aiding or abetting as charged in the indictment. First, the commission of an offense against the United States. Second, the commission or aiding, abetting, inducing or procuring the commission of an offense against the United States, or wilfully causing the commission of an offense.

Anything that a person may do for himself he may do through direction of another person, or by acting in concert with or under direction of another person or persons in a joint enterprise or effort.

A person may be punishable as a principal if he wilfully aids, abets, induces or procures the commission of an offense.

In order to aid and abet another to commit a crime, it is necessary that the defendant in some way associate himself with the venture, that he participate in it as something he wishes to bring about, that he seek by his action to make it succeed.

You may not find a defendant guilty of aiding and abetting unless you find beyond a reasonable doubt that every element of the crime, as defined in these instructions, was committed by some person, and that the defendant wilfully participated in its commission.

Mere presence at the scene of a crime and knowledge that a crime has been committed is not sufficient alone to establish that a defendant aided and abetted that crime. To be an aider and abettor, the accused must have knowledge of the criminal plan and must consciously share in the criminal act.

Every person who wilfully participates in the commission of a crime may be found guilty of that offense.

■ The jury, after deliberations, returned with this question:

"Is the fact that David Luke willingly went to the Holiday Inn in Sharonville to look at 'something' an act of aiding and abetting?"

After conferring with counsel, the judge stated, "the question of what constitutes aiding and abetting is for you to decide." In context, however, we do not think the judge's response can be reasonably construed to eliminate the *intent* element or other elements listed in the prior instruction. The jury would reasonably understand, we believe, that the question of intent was for them to decide. The instructions, and the response, therefore were adequate on the elements of aiding and abetting.

### ISSUE 10: Was There Misjoinder of Lawson with the Lukes?

Federal Rule of Criminal Procedure 8(b) states:

Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

■ With regard to the charged Count I conspiracy, Lawson argues that it did not allege his participation in two of the overt acts mentioned. The indictment lists these overt acts:

1. On or about March 12, 1980, at David's Antiques, Dayton, Ohio, DAVID

W. LUKE purchased for $1044.00 58 pieces of sterling silver which he knew had been stolen;

2. On or about May 5, 1980, at David's Antiques, Dayton, Ohio, DAVID W. LUKE purchased for $925.00 sterling silver pieces which he knew had been stolen and transported from outside the State of Ohio;

3. From on or about March 12, 1980 to on or about September 23, 1983, DAVID W. LUKE, PAULA LUKE, ALLEN C. LAWSON, MILFORD BARGER, DARRELL ROBBINS, GARY W. KETCHER, THOMAS H. CAFFEY and other co-conspirators used the telephone to carry out the activities of the conspiracy;

4. On or about September 8, 1982, ALLEN C. LAWSON met with DAVID W. LUKE and PAULA LUKE at David's Antiques, Dayton, Ohio;

5. On or about September 22 and 23, 1983, at the Holiday Inn, Sharonville, Ohio, DAVID W. LUKE and ALLEN C. LAWSON met with MILFORD BARGER, DARRELL ROBBINS, GARY W. KETCHER, and THOMAS H. CAFFEY;
....

Even if Lawson were correct in his assertion that a larger conspiracy alleged by the government may break down into separate mini-conspiracies, yet there is clear evidence that the main "Holiday Inn affair" includes both David Luke and Lawson. What Lawson neglects to mention is that the indictment sets out that "ALLEN C. LAWSON would arrange for other persons, including GARY W. KETCHER and THOMAS H CAFFEY, who wished to sell stolen goods, including stolen goods transported in interstate commerce from outside the State of Ohio into Ohio, to meet DAVID W. LUKE, PAULA LUKE, MILFORD BARGER and DARRELL ROBBINS for the purpose of their receiving stolen goods." Thus the government's theory was clearly set forth that Lawson was connected with many of the sales of stolen property by other persons to the Lukes.

It must be remembered, moreover, that the issue here concerns proper joinder.

There was evidence that could reasonably be interpreted to support the involvement by Lawson in one or more than one stolen property conspiracy with the Lukes. He simply objects to charges and proof that the Lukes were also involved in other unlawful acts not involving him.

Even if Lawson were neither *named* nor actually *related* to *some* of the overt acts mentioned, this is not compelling grounds for defeating joinder. *See United States v. Licavoli,* 725 F.2d 1040, 1051 (6th Cir.) ("The general rule in conspiracy cases is that persons indicted together should be tried together"), *cert. denied,* —— U.S. ——, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984). Lawson suggests that the majority opinion in *United States v. Hatcher,* 680 F.2d 438, 440–41 (6th Cir.1982) represents controlling precedent in his favor. We disagree. The *Hatcher* majority found misjoinder because one defendant was charged with *separate and unrelated crimes* (drug distribution counts) from that against the other defendant (drug possession). The *Hatcher* majority furthermore admitted that "Rule 8(b) should be construed in favor of joinder." 680 F.2d at 440. The charges here against each defendant were interrelated and pertained to similar types of offenses.

Lawson was not joined with a defendant with whom he was not alleged or proven to have any relationship. *See Kotteakos v. United States,* 328 U.S. 750, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946) ("thieves who dispose of their loot to a single receiver—a single 'fence'—do not by that fact become confederates"). Here the connections between Lawson and the Lukes are substantial. It was not error to try them together.

## ISSUE 11: Should the Trial Court Have Granted a Severance?

Federal Rule of Criminal Procedure 14 provides in relevant part:

If it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance

of defendants, or provide whatever other relief justice requires....

Lawson concedes that the standard for reviewing a decision not to sever is "abuse of discretion." *Licavoli, supra*, 725 F.2d at 1051. Lawson again emphasizes his lack of relation to allegedly separate conspiracies involving only the Lukes. It seems clear, however, that David Luke and Lawson were convicted of substantive counts by the jury due to the evidence directly surrounding the Holiday Inn arrest. Paula Luke not only had conspiratorial connections with her husband but also dealt with Lawson on a regular basis. The factual circumstances here do not support the severance contentions.

In *United States v. Gallo*, 763 F.2d 1504 (6th Cir.1985) this court rejected a similar "spillover" argument. *Id.* at 1526. *See also United States v. Bibby*, 752 F.2d 1116 (6th Cir.1985).

The *Bibby* rationale here applies to this case. Even if the Lukes and Lawson were tried only for a separate conspiracy encompassing the stolen property at the Holiday Inn, all the other evidence about the Luke-Lawson dealings "would be relevant to show the extent of the prior relationship." *Bibby*, 752 F.2d at 1123. Evidence not directly involving Lawson would be relevant to establish the fact that the Lukes were known professional fences. In any event, substantial prejudice as to Lawson is lacking under the circumstances. We find no error in denial of a severance.

**ISSUE 12: Did the Trial Court Err by Directing the Jury to "Find the Truth?"**

The trial court gave full instruction on the reasonable doubt standard. In concluding his instructions, the judge also stated:

Ladies and gentlemen, you are not partisans; you are not advocates; you are judges, impartial triers of the fact. We don't gather in a court of justice to provide community entertainment, but you and I know that does happen. We don't gather in a court of justice to provide a platform for the forensic rhetoric of lawyers, but you and I know that that happens. What we do is gather in a court of justice in an effort to ascertain the truth, the truth. That's why you were impanelled. That's why you have sat here listening to the evidence and that's what it is now your duty to do, determine the truth as truth is revealed to human beings. That's all there ever was. That's all there will ever be, an impartial jury determines the truth. No more. No less.

Lawson cites no case law precedent for the proposition that such a statement represents legal error particularly in view of the extensive jury instruction on the reasonable doubt standard.

The counsel for defendant Lawson applied to the district court for attorney fees under the Criminal Justice Act, 18 U.S.C. § 3006A(d), totalling $4,523.30. The district court reduced the attorney fee award to $3,245.50. On appeal, Lawson's counsel has raised as an issue the adequacy of this amount. We also AFFIRM Judge Rubin's determination on this issue as well.

The convictions of the Lukes and Lawson are AFFIRMED in all respects accordingly.