UNITED STATES of America, Plaintiff,

v.

Gary P. NORRIS, Defendant.

No. 2:06–cr–243–JDH–NMK.

United States District Court, S.D. Ohio, Eastern Division.

May 22, 2007.

Samuel Bernard Weiner, Columbus, OH, for Defendant.

Daniel Allen Brown, United States Attorney's Office, Columbus, OH, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

HOLSCHUH, District Judge.

On October 31, 2006, a grand jury returned a six-count Indictment, charging Defendant Gary P. Norris with knowingly and willfully misapplying, embezzling, abstracting, or purloining funds of Home National Bank ("HNB") in violation of 18 U.S.C. § 656. This case is currently before the Court on Defendant's Motion to Dismiss Indictment for Preindictment Delay (R. at 18). An evidentiary hearing was held on March 12, 2007, and both the Government and Defendant have subsequently submitted supplemental memoranda on whether delay in prosecuting this case has violated Defendant's right to due process under the Fifth Amendment. For the reasons set forth as follows, the Court finds that to the extent the prosecution of this case was delayed prior to the grand jury returning the Indictment, the delay does not violate the Due Process Clause of the Fifth Amendment.

## I. Background

The Indictment alleges that while a loan officer at HNB, Defendant opened a line of credit account and a number of loan accounts, disbursed and credited funds from these accounts without the knowledge of the persons for whom the accounts had been opened, and failed to fully repay or otherwise properly account for HNB funds. Specifically, Defendant is alleged to have misapplied funds collectively exceeding $444,000 from accounts in the names of Jeffrey Harris, Rickie Miller, Peggy Hill, Justin Hill, and Max Hill.

FBI Special Agent Charles Seymour has been assigned to the Athens, Ohio resident agency for approximately the last eleven years. (Hr'g Tr. 17–18, R. at 37.) The Athens resident agency is normally staffed by two agents, but, during spring 2001, Seymour was the only agent working out of that office. (*Id.* at 19.) In May 2001, he was contacted by HNB regarding a suspicious activity report ("SAR")[1] that the bank was filing containing allegations of suspicious activity by Defendant. (*Id.*) Consequently, Seymour commenced an investigation and began interviewing the HNB customers named in the SAR. (*Id.* at 20.) Seymour interviewed some witnesses during the summer of 2001, including Max Hill and Peggy Hill. (*Id.* at 20, 30–31.)

According to Seymour, the terrorism attacks on September 11, 2001 substantially interfered with his ability to continue investigating the allegations contained in the SAR. (*Id.* at 20–21.) After September 11, 2001, the FBI's resources were focused on the World Trade Center attack and other terrorism matters. (*Id.* at 20.) As a result, Seymour's duties were reprioritized. (*Id.* at 21.) Anything related to the September 11 attacks had precedent over oth-

---

**1.** National banks are required to "file a Suspicious Activity Report when they detect a known or suspected violation of Federal law or a suspicious transaction related to a money laundering activity or a violation of the Bank Secrecy Act." 12 C.F.R § 21.11(a).

er investigations. (*Id.*) Seymour was able to conduct interviews fairly regularly before September 11, but, after the attacks, interviews were conducted with significantly less frequency. (*See id.* at 34.)

Because of the large number of loan applications that needed to be examined and the complexity of the case, Seymour requested that a financial analyst assist him in his investigation. (*Id.* at 23.) The requested financial analyst was unavailable at the time, however, because she was assigned to terrorism matters. (*Id.*) Seymour testified that the financial analyst was not able to begin reviewing the compiled evidence until about 18 to 24 months after the investigation commenced. (*Id.*) As the analyst reviewed the evidence, she identified sources of information that could possibly help her better understand the transactions between the several accounts that were being investigated. (*Id.* at 23–24.) Seymour was provided updates from the analyst on a "semi-regular" basis, and she apprised him of individuals to contact and bank records to obtain to further the investigation. (*Id.*)

An additional FBI agent was assigned to the Athens resident agency some time in either the latter half of 2003 or the beginning of 2004. (*Id.* at 21.) With the arrival of a second agent, Seymour was able to spend more time on matters that had been deemed lower priorities. (*Id.* at 21–22.) Seymour testified that once he received his partner, he was able to spend more time interviewing individuals identified by the financial analyst, and he went "back to investigation full time." (*Id.* at 34.) The last interviews related to the investigation of the present case were completed in either 2005 or 2006. (*Id.* at 20.)

Around 2005, the financial analyst completed her review of the evidence collected.

(*Id.* at 24.) Seymour then began working with the United States Attorney's office. (*Id.*) The financial analyst and Seymour met with Assistant United States Attorney Dan Brown and explained the pertinent bank records and the transfers of funds between the different accounts. (*Id.*) Thereafter, Seymour assisted Brown in preparing the Indictment in this case. (*Id.* at 25.) Their efforts culminated in the grand jury returning the Indictment on October 31, 2006. (*Id.* at 25–26.)

## II. Dismissal for Pre–Indictment Delay

### A. Standard

█ Statutes of limitation provide the primary protection against the government bringing overly stale criminal charges. *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). Nonetheless, because statutes of limitation do " 'not fully define (defendants') rights with respect to the events occurring prior to indictment' ... the Due Process Clause has a limited role to play in protecting against an oppressive delay." *Id.* (quoting *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)).

In *Lovasco*, the Supreme Court was confronted with the issue of when does a lengthy pre-indictment delay violates rights protected by the Due Process Clause of the Fifth Amendment. The Court first noted that "proof of actual prejudice makes a due process claim concrete and ripe for adjudication," but a showing of actual prejudice alone is not enough to establish a violation of the Due Process Clause.[2] *Lovasco*, 431 U.S. at 789, 97 S.Ct. 2044. The reason for the delay must also be considered. *Id.* at 790, 97 S.Ct. 2044. Considering the prejudice from and the reason for the delay, a defendant's due

---

**2.** "[P]roof of prejudice is generally a necessary but not sufficient element of a due process claim." *United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

process rights are violated only when "compelling [the defendant] to stand trial ... violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' and which define 'the community's sense of fair play and decency.'" *Id.* (quoting *Rochin v. California*, 342 U.S. 165, 173, 72 S.Ct. 205, 96 L.Ed. 183 (1952); *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935)) (internal citation omitted).

Regarding the circumstances of the case before it, the Court held that a defendant's due process rights are not violated when his prosecution is delayed by government investigation, "even if his defense might have been somewhat prejudiced by the lapse of time." *Id.* at 796, 97 S.Ct. 2044. The Court discussed several reasons for prosecutors to defer the seeking of an indictment that do not deviate from "fundamental conceptions of justice," including (1) waiting until they have probable cause to believe the accused is guilty, (2) waiting until they are satisfied that they will be able to establish guilt beyond a reasonable doubt, (3) investigating further to determine whether "a criminal transaction involves more than one person or more than one illegal act," and (4) considering "the desirability of not prosecuting particular cases." *Id.* at 791–95, 97 S.Ct. 2044. The Court collectively referred to these reasons for pre-indictment delay as "investigative delay." *See id.* at 795, 97 S.Ct. 2044. The Court stated that "investigative delay is fundamentally unlike delay undertaken by the Government solely 'to gain tactical advantage over the accused.'" *Id.* at 795, 97 S.Ct. 2044 (quoting *Marion*, 404 U.S. at 324, 92 S.Ct. 455). While the latter violates the rights of the accused when he has suffered actual prejudice as a result of the delay, the former does not.

Based upon the Supreme Court's decisions in *Lavasco* and *Marion*, the Sixth Circuit has held that "dismissal for pre-indictment delay is warranted only when the defendant shows substantial prejudice to his right to a fair trial and that the delay was an intentional device by the government to gain a tactical advantage." *United States v. Brown*, 667 F.2d 566, 568 (6th Cir.1982) (per curiam).

## B. Application

### 1. Substantial Prejudice

■■■ As the Court noted in *Lavasco*, pre-indictment delay cannot violate a defendant's due process rights unless he can show actual prejudice to his right to a fair trial. The defendant has the burden of demonstrating prejudice. *E.g.*, *United States v. Lawson*, 780 F.2d 535, 541–42 (6th Cir.1985). A lengthy delay in prosecuting the defendant, by itself, does not constitute actual prejudice. The defendant must demonstrate how the length of the delay has prejudiced his ability to have a fair trial.

■■■ Defendant contends that he has suffered substantial prejudice primarily as a result of several key defense witnesses dying during the delay in the prosecution of this case. According to Defendant, Max Hill, a long-time client of Defendant's at HNB, died in the fall of 2001. Defendant states that Max Hill would have been able to testify regarding his understanding of a floor plan agreement made with HNB through Defendant that had not been reduced to a writing, other oral agreements related to his accounts at HNB made with Defendant, and his understanding of loans taken by him in the names of Peggy Hill, Justin Hill, and Rick Miller. (Hr'g Tr. 13.)

Defendant also states that three former HNB directors who would have been witnesses in this case died prior to the filing of the Indictment. Wayne Roush died February 23, 2005. (*Id.* at 27.) In addition to being a director of HNB, Roush

was also on the bank's loan review committee. (*Id.* at 13–14.) As a member of this committee, Roush reviewed loans to ."criticized" borrowers, including Max Hill. (*Id.* at 14.) Defendant states that if Roush were not deceased, he would be able to testify as to why and how Max Hill was approved for loans at HNB. (*Id.*) George Neigler, another former director, died August 22, 2001. (*Id.* at 27.) Defendant states that Neigler executed agreements on behalf of HNB with the Office of the Comptroller of Currency ("OCC"). (*Id.* at 14.) Neigler would have been able to testify that a large portion of HNB's loan portfolio was criticized by the OCC, not just the loans that had been made by Defendant. (*Id.*) Finally, Carroll Norris, a distant relative of Defendant and former director of HNB, died just before the grand jury returned the Indictment. (*Id.*) As a retired car dealer, Carroll Norris took great interest in the loans that Max Hill, also a car dealer, took to finance his floor plan. (*Id.* at 15.) Carroll Norris would have been able to testify regarding HNB's lending practices to finance auto dealer floor plans. (*Id.* at 16.)

As the Sixth Circuit noted in *United States v. Rogers,* 118 F.3d 466, 475 (6th Cir.1997), "death of a potentially material witness during an undue pre-indictment delay may prove prejudicial," but death of a witness alone is not determinative.

> The death of a potential witness during the pre-indictment period may demonstrate the requisite prejudice if the defendant can demonstrate that exculpatory evidence was lost and could not be obtained through other means. However, a defendant does not show actual prejudice based on the death of a potential witness if he has not given an indication of what the witness's testimony would have been and whether the substance of the testimony was otherwise available.

*Id.* (citing *United States v. Corbin,* 734 F.2d 643, 648 (11th Cir.1984)) (internal citation omitted).

Defendant has provided the Court with an indication of what the substance of the testimonies of Max Hill, Roush, Neigler, and Carroll Norris would have been. Defendant argues that without these potential witnesses' testimonies he has lost exculpatory evidence because they "could have provided excellent insight as to whether or not [Defendant] was acting in an unlawful manner." (Def.'s Supplemental Mem. Supp. 5.) The Government disagrees, arguing that the former directors' testimonies are not exculpatory because the Indictment does not allege that the loans themselves were illegitimate. The charges in this case, the Government contends, relate to transactions within the various accounts being made "without the knowledge or authorization of the person for whom the line-of-credit and the loan files had been opened." (Government's Mem. Opp'n 4.) Thus, according to the Government, the former directors' testimonies regarding HNB's lending practices are not exculpatory because they do not tend to make any fact of consequence more or less probable.

Although Defendant has provided the Court with a general description of the subjects on which the deceased witnesses would have testified, there is no mention as to how their testimonies exculpate Defendant of the offenses alleged in the Indictment. Defendant states that Max Hill would have testified about his understanding of his agreements with HNB, but there is no indication of what his understanding was or how it relates to the alleged misappropriations of HNB funds charged in the Indictment. Roush, Neigler, and Carroll Norris may have been able to testify as to HNB's lending practices generally and loans made by Defendant specifically; nevertheless, Defendant has

not demonstrated what, if any, exculpatory evidence their testimonies would have provided. There is no indication of how these witnesses would have testified as to whether loans made by Defendant were consistent with the bank's lending practices, and, even if there were, Defendant has not explained how that evidence would be relevant to the charges of misappropriating funds. Additionally, even though Defendant declares that these witnesses could have provided insight as to the lawfulness of Defendant's conduct, Defendant has not explained what insight they could have provided. Given the overly generalized description of what the substance of the deceased witnesses' testimonies would have been and the lack of explanation as to how their testimonies relate to the offenses charged in the Indictment, the Court is left to guess as to how the deceased witnesses would have provided Defendant with exculpatory evidence.

Defendant has also made little effort to explain how the substance of the deceased individuals' testimonies is not otherwise available. Of course, only Max Hill could testify as to his own understanding of his agreements with HNB and his understanding of the loans taken in the names of Peggy Hill, Justin Hill, and Rick Miller. By contrast, there is no evidence that only Roush could have testified as to why Max Hill was approved for loans at HNB. Nor has there been any showing by Defendant that only Neigler could have testified regarding the portion of the bank's portfolio that was criticized by the OCC. Additionally, Defendant has not demonstrated how the substance of Carroll Norris's testimony about HNB's auto floor plan lending practices could not be obtained from another source. Defendant, therefore, has not shown how the substance of these three potential witnesses' testimonies is otherwise unavailable.

■ In addition to these witnesses being unavailable to testify, Defendant argues that his ability to prepare a defense has been prejudiced because the memories of key witnesses, including Seymour and Tom Wolfe, the former president of HNB, have faded. Defendant notes that during his testimony, Seymour was unable to recall several facts related to his investigation. For instance, Seymour could not recall the names of witnesses identified in the SAR, when he interviewed some of the witnesses, how often he assisted other FBI offices within the FBI's Cincinnati division after the September 11 attacks, or in which part of 2005 he provided documentary evidence to Brown. (*Id.* at 31, 36–37.) Defendant posits that if Seymour has difficulty remembering these facts, it can reasonably be inferred that Wolfe's memory of events that happened up to ten years ago will have faded as well.

In a dictum from *United States v. Atisha*, 804 F.2d 920, 928 (6th Cir.1986), the court stated that a witness's faulty memory resulting from a pre-indictment delay could satisfy the requirement that defendant suffer actual prejudice from the pre-indictment delay. Subsequent to *Atisha*, however, the Sixth Circuit has foreclosed this argument. In *United States v. Wright*, 343 F.3d 849, 860 (6th Cir.2003), the Court held that loss of memory is insufficient to establish prejudice as a matter of law. Thus, irrespective of the degree to which Seymour's and Wolfe's memories have faded, Defendant cannot show that he has suffered substantial prejudice as a result of these witnesses' memory loss.

■ Finally, Defendant asserts that he is prejudiced by documentary evidence, which may contain exculpatory information, no longer being available. Specifically, Defendant states that he is without the HNB practice and procedures manuals

that were in effect between 1996 and 2006, which may contain exculpatory evidence. The Government responds that since Defendant filed his Supplemental Memorandum in Support it has delivered to Defendant the bank records sought. According to the Government, Defendant has received a copy of the bank's lending policy that was approved November 10, 1998, a file containing all materials that could constitute HNB's quarterly loan review reports, and all reports from external auditors that exist within HNB's files. Although documentary evidence being lost during a pre-indictment delay could certainly prejudice a defendant, it appears that Defendant possesses the documentary evidence claimed to be unavailable. Accordingly, Defendant has not shown substantial prejudice because of documentary evidence no longer being available.

Defendant argues that the prejudice that he has suffered as a result of pre-indictment delay is similar to that experienced by the defendant in *United States v. Sabath,* 990 F.Supp. 1007 (N.D.Ill.1998). In *Sabath,* the court dismissed the indictment charging the defendant with burning his place of business because "the combination of deceased key witnesses, memory-impaired witnesses, and missing evidence prejudiced severely Defendant's ability to defend [his] case." *Id.* at 1012–13. *Sabath* is distinguishable from the present case in several respects. First, the defense in *Sabath* demonstrated how the testimonies of deceased witnesses would have provided the defendant with exculpatory evidence.[3] *Id.* at 1010–11. It was also evident that the substance of these witnesses' testimonies was not otherwise available. *See id.* Second, in that case the Government lost physical evidence that was shown to be key to the defense. *Id.* at 1010. Third, the court in *Sabath* was not bound by the Sixth Circuit's holding in *Wright.* As such, it was free to consider the impaired memory of the only living witness on the premises at the time of the fire other than the defendant. *Id.*

In comparison to *Sabath,* Defendant's showing of prejudice is incomplete. Defendant has not demonstrated to the Court how the purported testimonies of the deceased witnesses would have helped exculpate him. He has not explained how the substance of their testimonies is otherwise unavailable. He has not shown that physical evidence is no longer available. Because Defendant has not provided the Court with a sufficient explanation of how his defense has been affected negatively by the pre-indictment delay, the Court cannot find that Defendant has suffered substantial prejudice.

### 2. Reason for the Delay

■ The due process rights of the defendant are not violated in the absence of bad faith on the part of the prosecution. *United States v. Talbot,* 825 F.2d 991, 1000 (6th Cir.1987). For there to be a Due Process Clause violation, there must be proof of intentional government delay to gain a tactical advantage over the defendant. *Lawson,* 780 F.2d at 541; *see United States v. Gouveia,* 467 U.S. 180, 192,

---

**3.** For instance, the defendant's deceased father, one of two persons other than the defendant on the premises at the time of the fire, "would have credibly testified that Defendant did not have an opportunity to start the fire." *Sabath,* 990 F.Supp. at 1011. Another witness would have testified that he left work early on the day of the fire on his own accord, instead of being purposefully sent home by the defendant as the Government asserted. *Id.* This second witness would have also testified as to the lack of a financial motive by the defendant for burning the business. *Id.* Finally, the third deceased witness was the case agent who primarily investigated the fire. *Id.* Because he was no longer available, the defense lost his testimony as to the adequacy of the initial investigation. *Id.*

104 S.Ct. 2292, 81 L.Ed.2d 146 (1984). Defendant contends that the Government sought to gain a tactical advantage in this case because it knew that delaying the prosecution would make it difficult or impossible for witnesses to be available, that memories of available witnesses would fade over time, and that evidence would no longer be available as a result of the delay.

■ Defendant has not presented any evidence to support these arguments. Normally, in undertaking the burden of proving the Government's intent to gain a tactical advantage, the defendant must rely upon circumstantial evidence. The uncontroverted circumstantial evidence in this case, however, does not show that the Government acted in bad faith. Of the four potential defense witnesses now deceased, the Government was not familiar with three until Defendant moved the Court to dismiss the Indictment on February 26, 2007. (Hr'g Tr. 26–28.) The one witness with whom the Government was familiar, Max Hill, died in fall 2001, no more than a few months after Seymour received the SAR. As the Government was not familiar with three of the potential witnesses and the other died a short time after the investigation began, it seems extremely improbable that the Government intentionally delayed the prosecution of this case on the chance that witnesses would not be available to testify at trial.

Instead, it appears that the delay was caused by (1) the FBI office responsible for the investigation being understaffed, (2) FBI agents and analysts focusing their efforts on matters related to terrorism activities, (3) the amount of evidence to that needed to be examined, and (4) the complexity of the case in general. These circumstances combined to extend the length of the Government's investigation. Even if Defendant could conceivably show that he is somehow prejudiced by the time that elapsed during the investigation, the delay in this case does not constitute a violation of Defendant's due process rights. *See Lovasco,* 431 U.S. at 796, 97 S.Ct. 2044; *see also United States v. Mason,* 911 F.2d 734, 1990 WL 120736, at *2 (6th Cir. Aug. 20, 1990) (unpublished) (A delay caused by a backlog of cases within the U.S. Attorney's office does not violate the Fifth Amendment.).

■ Defendant also argues that the Government acted recklessly by not recognizing that there was an appreciable risk that delay in prosecuting this case would substantially prejudice him. Defendant contends that had Seymour conducted a more thorough investigation, he would have been familiar with the now-deceased bank directors, and he would have realized that if the investigation were delayed, there was a possibility that they would be unavailable to testify. More generally, Defendant claims that Seymour acted recklessly because he failed to complete his investigation sooner when there was no legitimate cause for delay. Quoting *Payne v. Rees,* 738 F.2d 118, 122 (6th Cir.1984), Defendant states that to show that a preindictment delay has violated a defendant's due process rights, the defendant must show either that "the government has no valid reason for the delay or that there was some tactical advantage sought to be obtained by the delay." Defendant argues that even if it is not shown that the Government sought some tactical advantage by the delay, the evidence shows that the Government had "no valid reason for the delay" because the delay was the result of Seymour's own reckless or negligent conduct in managing the investigation and not by any legitimate delay. Defendant contends that because Seymour could not recall at the hearing how often he went to other FBI offices to assist with terrorism related matters (Hr'g Tr. 36), he has not provided an explanation of how 9/11 affect-

ed his job activities and "he has essentially provided no valid reason for not handling Mr. Norris' case in a timely manner." (Def.'s Supplemental Mem. Supp. 7–8.)

■ Defendant's arguments lack merit. The Sixth Circuit has repeatedly rejected invitations to find violations of the Due Process Clause even when a defendant suffers prejudice as a result of pre-indictment delay caused by reckless or negligent conduct. *E.g., Rogers*, 118 F.3d at 476 (rejecting the argument that "reckless or negligent disregard of a potentially prejudicial circumstance violates the Fifth Amendment guarantee of due process"); *United States v. Miller*, 91 F.3d 145, 1996 WL 426135, at *1 (6th Cir. July 29, 1996) (unpublished) (noting that modifying the second prong of *Brown* would cause many of the deleterious effects that the Supreme Court recognized in *Lovasco* ). Accordingly, even if the Government were reckless or negligent in its investigation of Defendant, this would not require a finding that Defendant's due process rights have been violated.[4]

Furthermore, contrary to Defendant's belief, the Government has provided valid reasons for the delay in the investigation. Although Seymour could not recall the specific frequency in which he traveled to other FBI offices in southern Ohio, he testified that investigations related to the World Trade Center attack interfered with his investigation of this case.[5] (Hr'g Tr. 20–21.) He also stated that terrorism related matters had priority over other investigations for which he was responsible. (*Id.*) Defendant has presented no evidence to the contrary. Rather, he construes Seymour's testimony on cross-examination as indicating that his regular job activities were redirected to terrorism related investigations only on the occasions in which he assisted other offices. Seymour's testimony as a whole, however, does not support such a narrow construction. Furthermore, there were other valid reasons for the delay as noted earlier in this opinion.

Finally, although the court in *Payne* stated that a defendant could prevail on a due process claim by showing either that the government has no valid reason for the

---

**4.** There appears to be some authority to the contrary. *E.g., United States v. Ross*, 123 F.3d 1181, 1184–85 (9th Cir.1997) ("Preindictment delay that results from negligence or worse may violate due process."). Additionally, while in the Sixth Circuit the defendant must show both actual prejudice resulting from the delay and that the delay was an intentional device to gain a tactical advantage, other courts balance the prejudice to the defendant against the government's reason for the delay to determine whether the preindictment delay violates "fundamental conceptions of justice." *E.g., id.* at 1185; *United States v. Automated Med. Labs.*, 770 F.2d 399, 403–04 (4th Cir.1985).

**5.** Seymour testified as follows:
Q: Now this is a pretty long period of time that you have indicated to interview people. Was there something that happened that interfered with your ability to pursue this case?

A: Yes, there was. Right after this, 9/11 in 2001 occurred, and all of the FBI's resources were basically directed towards interviewing, covering leads as they related to the attack on the World Trade Center as well as other terrorist matters that were being developed at that time.

. . . .

Q: So for some period of time your work was redirected?

A: Yes, basically prioritized. I continued to be a one-man [resident agency]. I had the responsibilities and the duties to the counties in which I am responsible for covering and investigating any matters in there. But pretty much there were time constraints and restrictions on what had to be done and prioritized. And anything that had to do with the World Trade Center incident obviously had precedent at that time.

(Hr'g Tr. 20–21.)

delay or that there were tactical advantages sought to be obtained by the delay, *Payne* was decided two years after *Brown* and is squarely at odds with the earlier binding precedent. Moreover, the overwhelming majority of decisions by the Sixth Circuit and by district courts within this circuit have followed *Brown*, requiring the defendant to show intent of the government to gain a tactical advantage. *E.g., United States v. Atchley*, 474 F.3d 840, 852 (6th Cir.2007); *Wright*, 343 F.3d at 859; *United States v. Duncan*, 763 F.2d 220, 222 (6th Cir.1985); *United States v. Avila*, 410 F.Supp.2d 626, 627 (W.D.Mich. 2005); *United States v. Couch*, 822 F.Supp. 457, 461 (S.D.Ohio 1993) (Spiegel, J.). *Contra United States v. DeClue*, 899 F.2d 1465, 1468–69 (6th Cir.1990) (following *Payne* ).

Defendant, therefore, must show that the Government purposefully delayed the prosecution of this case to gain a tactical advantage. As discussed above, the evidence before the Court completely fails to establish any such intent.

### III. Conclusion

Although more than five years elapsed from the time that the Government began its investigation of this case to the date on which the grand jury returned the Indictment, Defendant has failed to sustain his burden of showing that he was so prejudiced by that delay that his right to due process was violated. In addition, there is absolutely no evidence to support a finding that there was any intent of the Government to delay prosecution in order to obtain a tactical advantage in the prosecution, the established second requirement to show a violation of Defendant's right to due process because of a pre-indictment delay. Accordingly, Defendant's Motion to Dismiss Indictment for Preindictment Delay (R. at 18) is **DENIED.**

**IT IS SO ORDERED.**